

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-21-2001

# In Re: Cendant Corp Prides Litigation

Precedential or Non-Precedential:

Docket 99-5555

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"In Re: Cendant Corp Prides Litigation" (2001). *2001 Decisions.* Paper 55.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/55

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 21, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-5555

IN RE: CENDANT CORPORATION PRIDES LITIGA TION

WELCH & FORBES, INC., an institutional investment
manager, individually and on behalf of all others
similarly situated,

v.

CENDANT CORPORATION, MERRILL LYNCH & CO.;
CHASE SECURITIES, INC.; HENRY R. SILVERMAN;
WALTER A. FORBES; COSMO CORIGLIANO

JOANNE A. ABOFF FAMILY TRUST,

        Appellant

Pursuant to Rule 12a

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 98-02819)
District Judge: Honorable William H. W alls

Argued: Friday, December 15, 2000

BEFORE: SCIRICA, FUENTES
and GARTH, Circuit Judges

(Opinion Filed: March 21, 2001)

Howard B. Sirota (argued)
Sirota & Sirota LLP
110 Wall Street, 21st Floor
New York, New York 10005

Counsel for Appellant

Roger Kirby (argued)
Kirby McInerney & Squire LLP
830 Third Avenue, 10th Floor
New York, New York 10022

Counsel for Plaintiffs-Appellees

Samuel Kadet (argued)
Skadden, Arps, Slate, Meagher &
 Flom LLP
Four Times Square
New York, New York 10036

Counsel for Defendants-Appellees

OPINION OF THE COURT

GARTH, Circuit Judge:

This appeal arises out of a class action filed on behalf of
investors in Cendant Corporation ("Cendant") after Cendant
disclosed prior "accounting irregularities" on April 15, 1998.1
Several actions were filed as a result of this disclosure,
including an action commenced on June 15, 1998 on
behalf of purchasers of Cendant's Feline PRIDES shares.
The PRIDES litigation was subsequently consolidated with
the other pending Cendant actions. However, on August 4,
1998, the District Court ruled that separate lead plaintiffs
and lead counsel were to represent the interests of the
PRIDES shareholders, as distinct from the rest of the
Cendant class. (JA1300-01.)

The firm of Kirby, McInerney & Squir e, formerly
Kaufman, Malchman, Kirby & Squire, ("Kirby") was

_____

1. Although there are other defendants, we refer to all the defendants as
Cendant.

2

appointed as lead counsel of the Cendant PRIDES class. On November 12, 1998, Kirby filed a motion for class certification, for summary judgment on the claims under S 11 of the Securities Act, and for injunctive relief. On behalf of the PRIDES class, Kirby entered into a proposed settlement agreement with Cendant on Mar ch 17, 1999-- three and a half months after Kirby's motions were filed and no more than nine months after the action had been started.

Under the settlement agreement, Cendant agr eed to issue Rights to new PRIDES, with a stated value of $11.71. (JA576-79.) Those rights were in trade for existing PRIDES. The total possible number and amount of Rights to be distributed pursuant to the agreement was 29,161,474, with an approximate stated value of $341,500,000. (JA590.) Regarding Kirby's attorneys' fees, the settlement agreement provided: "Cendant . . . will take no position on an application by Lead Counsel for an award of fees and expenses provided that such application shall not request fees in excess of 10% percent [sic] of the aggregate Stated Value of 29,161,474 Rights, which is appr oximately $341,500,000, plus reasonable expenses incurr ed by Lead Counsel in connection with this Action." (JA590.)

The Notice of Pendency of Class Action summarized the proposed settlement of the PRIDES litigation. (JA239-52.) In connection with "Lead Counsel's fees and expenses," the Notice stated: "Lead Counsel has notified the other signatories hereto that it intends to apply to the Court for an award of fees, in an amount not to exceed 10% of the aggregate Stated Value of 29,161,474 Rights, or approximately $34.1 million, plus reasonable expenses." (JA247.) The Notice went on to explain how the attor neys' fees would be paid, first out of "Unclaimed Rights,"2 then

_____

2. "Unclaimed Rights" are defined in the Stipulation and Agreement of Compromise and Settlement as "Rights as to which a timely and valid Proof of Claim has not been filed by a Holder ." (JA576.) All Unclaimed Rights "shall be cancelled and Cendant shall not issue, sell, or distribute
any further Rights to any other person." (Notice of Proposed Settlement, JA248.) In addition, the Settlement provided that, though "Merrill Lynch beneficially owned 738,526 PRIDES as of the close of business on April 15, 1998, Merrill Lynch nevertheless is not a class member and cannot recover new PRIDES in connection with the Settlement." (JA577.)

3

out of "Opt Out Rights," then out of the rights of class members with claims.3

The Notice also asserted:

> You also should know that the lead counsel appointment process included a court-mandated bidding process. This was intend to assur e that the largest possible portion of any recovery remained with participating class members, or conversely that qualified lead counsel took the least possible sums from the benefits to be obtained by participating class members. In Lead Counsel's view, under the fee mechanism proposed by Lead Counsel and described herein, there is a substantial likelihood that a substantial part, if not all, of the fees sought will be obtained from Unclaimed Rights and Opt Out Rights. As a consequence, in Lead Counsel's view, those Class Members who become Authorized Claimants will not have to pay any of Lead Counsel's fees, or if they do, there is a substantial likelihood that it will be less than the amount otherwise payable under the bids appr oved by the Court in the process of appointing lead counsel.

(JA247.)

On May 4, 1999, the Joanne A. Aboff Trust ("Trust") filed several objections to the notice of settlement, all of which pertained to Kirby's representation and fee request,4 as well

_____

3. The settlement consisted of 29,161,474 Rights. After subtracting the attorneys' fees and expenses for Lead Counsel, 27,308,617 Rights remained. Proofs of Claim were filed with respect to 26,606,422 Rights, of which 22,502,782 Rights were validated by the claims administrator as of August 18, 1999. (Kirby Aff., Ex. L, atP 2.) Pursuant to the settlement agreement, the unclaimed Rights that were not used to pay Kirby for its fees and expenses were to be canceled by Cendant. Because the total amount of Rights requested in the Pr oofs of Claim (26,606,422 Rights) was less than the amount of the settlement, after subtracting the amount to be given to Kirby (1,650,680 Rights, valued at $19,329,463), no claiming class members have had or will have their recovery reduced by the fees and expenses taken by Kirby.

4. The Trust's objections concerned: 1) a "confidential Supplemental Agreement" between lead plaintiff and Cendant which was included in

4

as a notice of its intention to appear at the settlement hearing. (JA38-78.) At the settlement hearing on May 18, 1999, lead counsel stated that "[t]her e is no objection to the settlement," (JA736), and the Trust's attor neys objected only to selection of class counsel and Kirby's r equest for attorneys' fees.

On June 15, 1999, the District Court signed an Opinion and Order approving the settlement, stating: "The Court considers the settlement to be eminently fair and reasonable. The class is made completely whole by such compensation. There are no objections voiced to the settlement--only to the request for attor ney fees. The proposed settlement is approved subject to the following modifications to the attorneys' fees." In re Cendant Corp. PRIDES Litig., 51 F.Supp.2d 537, 541 (D.N.J. 1999).

The District Court granted Kirby's request for expenses, finding that the requested expenses of $2,367,493 were "reasonable and necessary to the prosecution of this litigation." 51 F.Supp.2d at 542. Then the Court found that, for attorneys' fees, Kirby should receive a number of Rights equivalent to 5.7% of the balance of Rights r eceived by the Class. That percentage amounts to 1,650,680 Rights, valued at approximately $19,329,463. The District Court directed "Lead Counsel to seek to satisfy payment of these awards of expenses and fees from any unclaimed Rights. Then, and only then, to the extent that such fees and expenses have not been satisfied by unclaimed Rights, shall any deficiency be assessed against and bor ne by the class." 51 F.Supp.2d at 542. The Court went on to instruct that "[a]ny rights unclaimed after authorized class claimants

_____

the Settlement but not published and apparently contained information about Cendant's and Lead Plaintiff 's obligations under the Settlement; and 2) "lead counsel's excessive fee request." (JA39-40.) The Trust argued, inter alia, that "[t]he combination of this unusual confidential agreement with Lead Counsel's excessive fee r equest . . . multiplies the potential that the class and the public will suspect that the settlement contains a collusive or improper provision by which Lead Plaintiff, Lead Counsel, and/or Cendant will benefit at the expense of the class." (JA46.) The text of this "Supplemental Agr eement" does not appear in the record, nor can we tell if it was discussed in the Notice.

5

and Lead Counsel have been issued their entitled Rights shall be canceled by Cendant Corporation." 51 F .Supp.2d at 542.

On June 15, 1999, the District Court entered an Order and Judgment[5] certifying the PRIDES class for settlement, approving the settlement "and the distribution of Rights and New PRIDES to Authorized Claimants set forth therein," dismissing with prejudice all settled claims, and awarding Lead Counsel 1,650,680 Rights as r easonable attorneys' fees and 202,177 Rights as r eimbursement of Lead Counsel's reasonable expenses. (JA728–30.) On the same date and as part of its opinion, the District Court denied the Trust's application for attor neys' fees. On July 22, 1999, the Trust timely appealed the District Court's June 15 Orders and Judgment.

We have jurisdiction over this appeal pursuant to the final order doctrine of 28 U.S.C. S 1291, and we review the District Court's award of attorneys' fees for an abuse of discretion, "which can occur `if the judge fails to apply the proper legal standard or to follow pr oper procedures in making the determination, or bases an awar d upon findings of fact that are clearly erroneous.' " Zolfo, Cooper & Co. v. Sunbeam–Oster Co., 50 F.3d 253, 257 (3d Cir. 1995) (quoting Electro–Wire Prods., Inc. v. Sirote & Permutt, P.C. (In re Prince), 40 F.3d 356, 359 (11th Cir. 1994)).

On August 27, 1999, Kirby filed a Motion in this court to dismiss the Trust's appeal for lack of standing, as well as presenting the standing issue in its appellate brief.

I.

Before we consider the merits of the Trust's appeal, a threshold question must be answered: does the Trust have standing to challenge the District Court's awar d of attorneys' fees to Kirby? See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94–95 (1998) (stating that "[t]he requirement that jurisdiction be established as a threshold

_____

5. The District Court judge signed both the Opinion and the Order and Judgment on June 15, 1999, but the Opinion was filed on June 16, 1999 and the Order and Judgment was filed on June 24, 1999.

matter `spring[s] from the natur e and limits of the judicial power of the United States' and `is inflexible and without exception' "). Because "the core component of standing is an essential and unchanging part of the case–or –controversy requirement of Article III," Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992), we may not hear this appeal if the Trust does not have standing.

"Ordinarily, only a party aggrieved by a judgment or order of a district court may exercise the statutory right to appeal therefrom. A party who receives all that he has sought generally is not aggrieved by the judgment af fording the relief and cannot appeal from it." Deposit Guar. Nat'l Bank v. Roper, 445 U.S. 326, 333 (1980) (emphasis added). In Ace Heating & Plumbing Co. v. Crane Co., the Third Circuit explicated the application of this principle to class actions, holding: "aggrieved class members may appeal any final order of a district court in pr oceedings held pursuant to Rule 23. This general proposition holds true even though such class members have the right to exclude themselves from the class." 453 F.2d 30, 32 (3d Cir. 1971) (emphasis added).

The standing question in this case is troublesome, because it appears as if the PRIDES settlement has provided the class members with full recovery and because any reduction in the amount of attorneys' fees to Kirby will not be distributed among the class members, but instead those rights will be returned to and canceled by Cendant. Therefore, Kirby argues, the T rust is not aggrieved by the award of attorneys' fees and has no standing to appeal.

While this argument admittedly has a superficial attraction because the PRIDES class members will seemingly recover a "dollar–for –dollar" return for their claims and Kirby's fees will not reduce their r ecovery, we nevertheless hold that the Trust does have standing to appeal the award of attorneys' fees. 6 We base this holding on two related concepts: 1) the nature of the relationship between class plaintiffs, class counsel, and defendants in

_____

6. Our holding that the Trust has standing to appeal disposes of the motion made by Kirby on August 27, 1999 to dismiss the Trust's appeal. We will deny that motion.

7

class actions requires that the "aggrieved" requirement be construed broadly in class action cases; and 2) the judiciary's independent authority over the appointment of class counsel, the grant of attorneys' fees, and the review of attorneys' fee awards in class actions. In connection with these two principles, we require that district courts conduct an extensive analysis and inquiry before deter mining the amount of fees, because we have an independent inter est in monitoring district courts' fee awards, particularly those awards stemming from Rule 23 class actions. See, e.g., Zucker v. Occidental Petroleum Corp., 192 F.3d 1323, 1328 (9th Cir. 1999); see generally Advisory Committee's Notes on Fed. R. Civ. P. 23, 28 U.S.C., Notes following Rule 23 (addressing, inter alia, "the question of the measures that might be taken during the course of the action to assure procedural fairness"). Indeed, we ar e in effect third parties to the fee award process, albeit silent parties for the most part until the award is finalized and r eviewed.

A.

Ostensibly, lead class counsel represents all class plaintiffs. However, in attempting to settle a large class action, class counsel must often spend more time negotiating with and interacting with the defendants than with their own clients. This situation presents several dangers. First, as we observed in Prandini v. National Tea Co., "a defendant is interested only in disposing of the total claims asserted against it[, and] the allocation between the class payment and the attorneys' fees is of little or no interest to the defense." 557 F.2d 1015, 1020 (3d Cir. 1977). Moreover, the "divergence in [class members' and class counsel's] financial incentives . . . cr eates the `danger . . . that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment for fees.' " In r e General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig. (hereinafter "In re GM Trucks"), 55 F.3d 768, 820 (3d Cir. 1995) (quoting Weinberger v. Great Norther n Nekoosa Corp., 925 F.2d 518, 524 (1st Cir. 1991).

This unique relationship among plaintif fs' counsel, plaintiffs, and defendants in class actions imposes a special

responsibility upon appellate courts to hear challenges to fee awards by class members whose claims may have been reduced or in some way affected in exchange for large fee awards. See In re GM Trucks , 55 F.3d at 819-21. This is so even in this case, where the Trust pr esumably will not benefit from a reduction in Kirby's attorneys' fees, because the PRIDES settlement was structured so that any remaining Rights will be returned to Cendant.

The Ninth Circuit addressed a similar situation in Zucker v. Occidental Petroleum Corp., 192 F .3d 1323 (9th Cir. 1999), pointing out in its discussion that, even where the plaintiff "gets the same money whether the fee is cut or not, . . . a client whose attorney accepts payment, without his consent, from the defendants he is suing, may have a remedy, and this remedy may extend to a plaintiff class whose class attorneys accept payment fr om the defendants the class is suing." 192 F.3d at 1326.

The Ninth Circuit took this reasoning a step further in Lobatz v. U.S. West Cellular of Calif., in which the court, holding that a class member had standing to appeal an attorneys' fee award "even though that award was payable independent of the class settlement," stated:

> If . . . class counsel agreed to accept excessive fees and costs to the detriment of class plaintiffs, then class counsel breached their fiduciary duty to the class[, and] any excessive award could be consider ed property of the class plaintiffs, and any injury they suffered could be at least partially redressed by allocating to them a portion of that award.

Lobatz, 222 F.3d 1142, 1147 (9th Cir . 2000).

Under the Ninth Circuit's analysis, ther efore, the Trust need not benefit from a reduction in Kirby's fee to have standing to appeal. Moreover, the Ninth Circuit suggested in Zucker that the requirement that class plaintiffs be aggrieved should be construed broadly, citing Judge Sneed's observation in his dissent in In r e First Capital Holdings "that `[a]rguably, a class member always retains an interest in attorney fees, even when her claims have been met in full.' " Zucker, 192 F .3d at 1328 (quoting In re

9

First Capital Holdings Corp. Fin. Prods. Sec. Litig., 33 F.3d 29, 31 (9th Cir. 1994) (Sneed, J., dissenting).

As a class member, the Trust was eligible to receive "one Right, a marketable security freely tradeable until February 14, 2001, having the terms described her ein for each Income PRIDES and Growth PRIDES ($50.00 face amount) beneficially owned by Class members at the close of business on April 15, 1998 if such Class member submits a valid and timely proof of claim form." (JA239.) The Notice of the Proposed Settlement stated that "[e]ach Right will be designed to have a stated or theoretical value of $11.71," but acknowledged that "the Rights may trade in the market at a price below their theoretical value." (JA239.) Moreover, the Notice stated that "Cendant believes that r ecoverable damages (if any) per share could be lower or higher than the per PRIDES damages estimated by lead counsel for the Class." (JA239.)[7]

Though Kirby asserts that each class member r eceived full recovery from this settlement, in which case, it is contended, the Trust would not be aggrieved by the fee award, the description of the settlement in the Notice and its ultimate implementation by class members is uncertain as to class members' actual recovery. Because class members received rights which must be traded on the market to be liquidated, a number of factors could contribute to class members not receiving the theoretical $11.71 per Right. It is noteworthy that the settlement provided class members with no immediate cash payment, but rather left class members in the position of r elying on the marketability of their new Rights for reimbursement of their claims. That reliance, apart from any other market risks, might itself be chancy in light of Cendant's history of "accounting irregularities" and in light of the recent market and economy slow down.

_____

7. The settlement, as noted above, provides for Rights which are "freely tradeable until February 14, 2001," which date has passed. The record does not disclose whether all the claimed Rights have been traded or the actual value of those Rights. Hence, because the r ecord is silent and the settlement itself has not been challenged on this appeal, we do no more than call attention to that aspect of the settlement.

10

Nor does even a "dollar-for-dollar" recovery in cash undermine our power and jurisdiction and our special responsibility to review fee awards. Indeed, though the fact of market fluctuation and its effect on the value of class members' recovery influences our decision that the Trust has standing, we are equally convinced of our appellate jurisdiction over class settlements in which plaintiffs received a "dollar-for-dollar" recovery in cash. Indeed, it would be preposterous to hold that, even where a district court awarded a fee of 75% of the recovery to class counsel, we would have no power to review such an inappr opriate and outrageous award in the absence of an objector whose claims had been directly reduced as a r esult of the award. Our oversight and supervisory function would necessarily come into play to correct such a decree. This duty of review with which we are vested will be discussed in more detail in the next section.

B.

As indicated above, we are convinced of our obligation to vacate the District Court's order awarding fees by the special position of the courts in connection with class action settlements and attorneys' fee awar ds. As we observed in In re GM Trucks,"a thorough review of fee applications is required in all class action settlements." 55 F.3d at 819. Specifically, the danger inher ent in the relationship among the class, class counsel, and defendants "generates an especially acute need for close judicial scrutiny of fee arrangements" in class action settlements.8 55 F.3d at 820. In discussing this duty of

_____

8. We should make clear that we do not attribute any motives or designs to Kirby that would indicate any conflict by Kirby with its responsibility to the class, nor do we mean to intimate that Kirby acted improperly. Indeed, as the District Court found and we have no r eason to dispute, Kirby discharged its function as lead counsel in exemplary fashion. The cautions we express, which are present in the unique context of class actions and the fee awards which arise in this context, pertain solely to the issue of whether, where class members have apparently received dollar-for-dollar recovery, standing is available for an objector to a fee award. For all the reasons we express here, we are satisfied that it is.

district courts to oversee class settlements in In re GM Trucks, we explained:

> the court's oversight task is considerably complicated by the fact that these attorney-class conflicts are often difficult to discern in the class action context, "where full disclosure and consent are many times difficult and frequently impractical to obtain." Finally, we emphasize that the court's oversight function serves not only to detect instances of "the actual abuse[that potential attorney-class conflicts] may cause, but also [the] potential public misunderstandings they may cultivate in regard to the interests of class counsel."

55 F.3d at 820 (quoting In re Agent Orange Prod. Liab. Litig., 818 F.2d 216, 224, 225 (2d Cir . 1987)). In other words, we indicated in In re GM T rucks the importance of the judicial role in finalizing class action settlements, and we suggested that this importance derived fr om general concerns about "potential public misunderstandings" as much as from a desire to protect the plaintiffs in the particular class.

In Zucker, in asserting that the district court was required to review the award of attorneys' fees regardless of whether anyone had standing to challenge the awar d, the Ninth Circuit stated:

> In a class action, whether the attorneys' fees come from a common fund or are otherwise paid, the district court must exercise its inherent authority to assure that the amount and mode of payment of attor neys' fees are fair and proper. This duty of the court exists independently of any objection. Therefor e it exists, a fortiori, regardless of whether an objector has a remediable economic stake in the court's decision. Because the district court had the authority and duty to pass upon the fairness of the attor neys' fees settlement independently of whether there was objection, we need not decide whether the objector had standing.

192 F.3d at 1328-29.

The court in Zucker further explained that"[n]o Article III case or controversy is needed with regar d to attorneys' fees

12

as such, because they are but an ancillary matter over which the district court retains equitable jurisdiction." 192 F.3d at 1329. The Ninth Circuit found support for this proposition in the reasoning of the Eighth Circuit that "because `the reasonableness of attor neys' fees is within the overall supervisory authority' of the court in a class action, the court did not need to reach the question of whether an objector has standing." Zucker, 192 F .3d at 1329 (quoting Grunin v. Int'l House of Pancakes, 513 F .2d 114, 127 n.13 (8th Cir. 1975)).

While the statements in In re GM T rucks and Zucker refer to the authority of district, not appellate, courts in connection with class action settlements, the cases make clear that reviewing courts retain an interest--a most special and predominant interest--in the fairness of class action settlements and attorneys' fee awar ds. Accordingly, our interest as a reviewing court in ensuring that district courts fulfill their obligations and comply with the instructions and guidelines in this area bolsters our determination that the Trust has standing to challenge Kirby's fee award.

Nor is our responsibility in connection with class action matters restricted to reviewing the final fee determination made by the District Court. Our interest and supervisory role is pervasive and extends not only to thefinal fee award but also to the manner by which class counsel is selected and the manner by which attorneys' fee conditions are established.

Here, the District Court employed a sealed-bid auction to select class counsel. That process, which occurred virtually at the inception of the instant class action, is itself fee-driven. As such, it invites, indeed requir es, judicial examination and, hence, our jurisdiction. This is so both because of the unique relationship between class members, class counsel, and the defendants in class actions and because of our strong interest in the fair ness of class settlements and the cost of achieving such settlements. See, e.g., John C. Coffee, Jr., National Law Journal, Sept. 14, 1998, at B6 (discussing selection of lead counsel through auctions and "bidding rules").

13

Because it is the district court's function to participate in the litigation process in this way, as the District Court did here, and because, as noted, our judicial scrutiny reaches to all corners of the class action process including the selection of class counsel--a selection which impacts on the final fee award and fairness of the settlement--we would be remiss if we failed to exercise our jurisdiction in this area.

An analogy, albeit one that is far afield fr om class action fees, is helpful to illustrate and emphasize the court's interest and the role that our inter est plays in our decision to hear this appeal. In Powers v. Ohio, a post-Batson case,[9] the Supreme Court held that a white criminal defendant had standing to object to and appeal the exclusion of black jurors through peremptory challenges, even though the defendant and the potential jurors were of different races. 499 U.S. 400 (1991). In its discussion of standing, the Court stated:

> The discriminatory use of peremptory challenges by the prosecution causes a criminal defendant cognizable injury, and the defendant has a concrete inter est in challenging the practice. This is not because the individual jurors dismissed by the prosecution may have been predisposed to favor the defendant; if that were true, the jurors might have been excused for cause. Rather, it is because racial discrimination in the selection of jurors "casts doubt on the integrity of the judicial process," and places the fair ness of a criminal proceeding in doubt.

Powers, 499 U.S. at 411 (internal citations omitted).

Likewise, just as discriminatory selection of jur ors "casts doubt on the integrity of the judicial process" such that the defendant in Powers had standing to appeal, the integrity and fairness of class settlements is thr eatened by excessive attorneys' fee awards such that class plaintiffs have

_____

9. In Batson v. Kentucky, 476 U.S. 79 (1986), the Supreme Court "held that a [black] defendant can raise an equal pr otection challenge to the use of peremptories at his own trial by showing that the prosecutor used them for the purpose of excluding members of the defendant's race." Powers v. Ohio, 499 U.S. at 405 (citing Batson, 476 U.S. at 96).

14

standing to challenge excessive fee awards, even when they have received dollar-for-dollar recovery in the class settlement.

Because of the possible injury to the Trust as well as other class members from the fee award in this case and, more importantly, because of our overarching interest in class fee awards, we therefore hold that the Trust has standing to appeal the fee award. Accordingly, we now turn to the fee award that the District Court granted to Kirby and review that award for an abuse of discretion. See In re GM Trucks, 55 F.3d 768, 782 (3d Cir. 1995).

## II.

There are two primary methods for calculating attorneys' fees: the percentage-of-recovery method 10 and the lodestar method.11 "The percentage-of-recovery method is generally favored in cases involving a common fund,12 and is designed to allow courts to award fees from the fund `in a manner that rewards counsel for success and penalizes it for failure.' " In re Prudential, 148 F.3d at 333. "The lodestar method is more commonly applied in statutory fee-shifting cases, and is designed to reward counsel for undertaking

_____

10. This method has been described as follows:"The percentage of recovery method resembles a contingent fee in that it awards counsel a variable percentage of the amount recovered for the class." In re GM Trucks, 55 F.3d 768, 819 n.38 (3d Cir. 1995).

11. The lodestar method was initially set forth in Lindy Bros. Builder, Inc.
of Philadelphia v. American Radiator & Standard Sanitary Corp., 487 F.2d 161 (3d Cir. 1973), appeal following remand, 540 F.2d 102 (3d Cir. 1976). As this court explained in Gunter v. Ridgewood Energy Corp., "[a] court determines an attorney's lodestar by multiplying the number of hours he or she reasonably worked on a client's case by a reasonable hourly billing rate for such services given the geographical area, the nature of the services provided, and the experience of the lawyer." 223 F.3d 190, 195 n.1 (3d Cir. 2000).

12. "[T]he common-fund doctrine . . . allows a person who maintains a lawsuit that results in the creation, preservation, or increase of a fund in which others have a common interest, to be reimbursed from that fund for litigation expenses incurred." Court Awarded Attorney Fees, Report of the Third Circuit Task Force, 108 F.R.D. 237, 241 (1985) (hereinafter "Task Force Report").

15

socially beneficial litigation in cases wher e the expected relief has a small enough monetary value that a percentage-of-recovery method would pr ovide inadequate compensation." 148 F.3d at 333.

The total settlement in this case was valued at $341,500,000, and the District Court granted attor neys' fees in the amount of $19,329,463.13 As the District Court noted, this amount constitutes 5.7% of the class's total recovery. In connection with the lodestar calculation, the District Court observed that "Lead Counsel, thr ough its principal partners, associates, and paralegals expended approximately 5,600 hours, and its senior partners have a regular hourly rate of $495." 51 F.Supp.2d at 542. Using the $495 hourly rate, the lodestar multiplier14 for the District Court's fee award is 7.15

Two primary principles govern our review of the District Court's fee award to Kirby: 1) did the District Court provide sufficient explanation for granting the fee awar d of $19.3 million?; and 2) was the award so unreasonably high that the District Court abused its discretion in granting that amount in attorneys' fees?

_____

13. Kirby's ceiling for fees, as explained in the Notice of Settlement, was
ten percent of the total settlement. The settlement was calculated at $341.5 million, ten percent of which would be $34,150,000. That figure was reduced by the District Court to $19,329,463.

14. The Task Force Report explained that, after the lodestar is calculated, "[t]he `lodestar' then could be increased or decreased based upon the contingent nature or risk in the particular case involved and the quality of the attorney's work. An incr ease or decrease of the lodestar
amount is referred to as a `multiplier.' " Task Force Report, 108 F.R.D. 237, 243.

15. 5,600 hours x $495 = 2,772,000. $19,329,463 divided by 2,772,000 = 6.97. This multiplier of 7 essentially comports with the information provided by Kirby after oral argument. In that letter, Kirby stated that "the blended hourly compensation to ourselves and those law firms who were working with us was approximately $3,300." (Dec. 19, 2000 Kirby Letter, at 2.) $3,300 divided by $495 = 6.67, only slightly less than the 6.97 multiplier calculated from the figur es provided by the District Court.

16

A.

In Gunter v. Ridgewood Energy Corp., we considered a district court's award of attorneys' fees in a class action settlement. 223 F.3d 190 (3d Cir. 2000). That case involved a $9.5 million settlement, out of which the district court allowed attorneys' fees amounting to 18% of the settlement fund, significantly less than the one-thir d requested by the attorneys. 223 F.3d at 191. The district court in Gunter explained its decision as follows: "The natur e of this litigation, its resolution at this stage without the necessity of trial, the nature of the settlement, and its value, convince the court that it would place a reasonable bur den on the class to award attorneys' fees of 18% of the Settlement Fund, or $1,700,000." 223 F.3d at 192 (citing Gunter v. Ridgewood Energy Corp., Civ. No. 95-438 (WHW), at 3 (D.N.J. Nov. 16, 1999)). The attorneys appealed the district court's reduction of their fee request.

In reviewing the district court's fee awar d in Gunter, we stated that "[w]e give [a] great deal of deference to a district court's decision to set fees." 223 F.3d at 195. However, we noted, "[n]otwithstanding our deferential standard of review, it is incumbent upon a district court to make its reasoning and application of the fee-awar ds jurisprudence clear, so that we, as a reviewing court, have a sufficient basis to review for abuse of discretion." 223 F.3d at 196. Therefore, "if the district court's fee-award opinion is so terse, vague, or conclusory that we have no basis to review it, we must vacate the fee-award order and remand for further proceedings." 223 F.3d at 196. In addition, "if a district court does not fulfill its duty to apply the relevant legal precepts to a fee application, it abuses its discretion by not exercising it." 223 F.3d at 196.

In Gunter, we vacated the district court's fee award because the district court "dealt with the fee-award issue in a cursory and conclusory fashion" and did not employ the factors which this Court has stated that district courts should consider in awarding fees using the per centage-of-recovery method in common-fund class actions. See Gunter, 223 F.3d at 196-97. These factors wer e set forth in Gunter in a footnote:

17

Among other things, these factors include: (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awar ds in similar cases.

Gunter, 223 F.3d at 195 n.1 (citing In re Prudential, 148 F.3d 283, 336–40 (3d Cir. 1998); In re GM Trucks, 55 F.3d 768, 819–22 (3d Cir. 1995)).

As in Gunter, the District Court's fee opinion in this case was too cursory for us to "have a sufficient basis to review for abuse of discretion." Gunter, 223 F.3d at 196. The District Court did not even specify whether it was using the percentage–of–recovery method or the lodestar method to set attorneys' fees. Nor, if the District Court intended to utilize the lodestar method, did it calculate the lodestar multiplier. Rather, the District Court, in a conclusory paragraph bereft of analysis, stated:

This Court has examined the time expended by Lead Counsel and the regular hourly rates of its services. Lead Counsel, through its principal partners, associates, and paralegals expended approximately 5,600 hours, and its senior partners have a r egular hourly rate of $495. This represents significant effort. But the Court is more impressed by the quality of result than the quantity of effort. The class will receive its full entitlement. And resolution of this matter was greatly accelerated by the creative dynamism of counsel. For this, counsel should not be penalized by a slavish application of the lodestar. W e have seen the gifted execution of responsibilities by a lead counsel.

51 F.Supp.2d at 542. Despite the District Court's obvious dissatisfaction with the lodestar method, the court did not even address the percentage–of–recovery method, except to the extent that it calculated that the fee awar d constituted 5.7% of the total class recovery.

18

The percentage-of-recovery method has long been used in this Circuit in common-fund cases. Indeed, in the 1985 Third Circuit Task Force r eport entitled Court Awarded Attorney Fees, the Task Force discussed the problems with the lodestar method in detail. "Accordingly, the Task Force recommend[ed] that in the traditional common-fund situation . . . , the district court . . . should attempt to establish a percentage fee arrangement." Task Force Report, 108 F.R.D. 237, 255 (1985). Since that time, we have several times reaffirmed that application of a percentage-of-recovery method is appropriate in common-fund cases. See, e.g., Gunter v. Ridgewood Energy Corp. , 223 F.3d 190, 195 n.1 (3d Cir. 2000); Brytus v. Spang & Co. , 203 F.3d 238, 243 (3d Cir. 2000); In re Prudential, 148 F.3d 283, 333-34 (3d Cir. 1998); In re GM Trucks, 55 F.3d 768, 821 (3d Cir. 1995).

Though this is not a traditional common-fund case, because the unclaimed portion of the settlement fund is returned to Cendant and because the plaintiffs who recover may not be affected by the attorneys' fee award (depending on the number of plaintiffs who recover rights from the fund), use of the percentage-of-recovery method is appropriate in this case. Since the District Court highlighted the inadequacy of the lodestar method, it can be assumed that that court also perceived that the percentage method was a better method of calculating attorneys' fees in this case. This is consistent with the District Court's opinion awarding attor neys' fees in the larger and separate Cendant settlement, in which it did declare, "[f]ollowing established Thir d Circuit law . . . , the Court will award fees by a percentage-of-r ecovery method." In re Cendant Corp. Litig., 109 F .Supp.2d 285, 298 (D.N.J. 2000).16

_____

16. By referring to the District Court's method of calculating attorneys' fees in the separate Cendant case (see  text at p. 2, supra, where we noted that the PRIDES shareholders were to be represented separately from the primary Cendant class), we by no means indicate that the fees awarded to the primary Cendant class wer e a proper exercise of the District Court's discretion. We leave that determination to the panel of this court assigned to review that fee awar d.

19

As discussed above, we have articulated at least seven factors to be considered by district courts in setting percentage fee awards in common fund cases. See Gunter, 223 F.3d 190, 195 n.1 (3d Cir. 2000). The District Court, however, did not explicitly consider any of these factors.17 In addition to rejecting the lodestar method, the District Court stated: "The Court appreciates Lead Counsel's verve and the eminently satisfactory results it obtained for the class. There are no objections to the settlement agreement." 51 F.Supp.2d at 541. In addition, the District Court mentioned the initial sealed bidding process and referred to the resulting bid to which Kirby agreed "as a benchmark of reasonableness." 51 F.Supp.2d at 542 (quoting In re Cendant Corp., 182 F.R.D. 144, 152 (D.N.J. 1998). However, when it came to setting the fee award, the District Court said simply, "[t]he Court determines that counsel fees of 5.7% of this net balance [of the total award less Lead Counsel's expenses of $2,367,493] are reasonable." 51 F.Supp.2d at 542.

It could be argued that, in the few terse statements quoted above, the District Court took into account three of the seven Gunter factors: "the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel"; "the skill and efficiency of the attorneys involved"; and "the amount of time devoted to the case by plaintifs' counsel." Gunter, 223 F.3d at 195 n.1. However, the District Court brushed over our required analysis of those factors in setting the attorneys' fees.

Significantly, the District Court did not consider at all the other factors which we deem to be more important in this case, namely "the complexity and duration of the litigation" and "the [range of] awards in similar cases." 223 F.3d at

_____

17. We recognize that our decision in Gunter was issued after the District Court ruled on the settlement and fee application in this case and that, therefore, the District Court could not have been informed in its decision by our holding in Gunter. However, all of the principles enunciated in Gunter have been announced by this court before, in cases predating the District Court's decision on appeal here. See, e.g., In re Prudential, 148 F.3d 283, 336-40 (3d Cir. 1998); In re GM Trucks, 55 F.3d 768, 819-22 (3d Cir. 1995)

20

195 n.1 (emphasis added). Nor does it appear that the District Court "cross-check[ed] the percentage award . . . against the `lodestar' award method," which is "suggested" practice for district courts setting fee awar ds by the percentage-of-recovery method. Gunter , 223 F.3d at 195 n.1. Further, the District Court did not"make its reasoning and application of the fee-awards jurisprudence clear." Gunter, 223 F.3d at 196.18

B.

Because the District Court failed to consider the Gunter factors that we deem essential to a proper exer cise of discretion and to an appropriate consideration of attorneys' fee awards, we will discuss those factors her e.

1. Complexity and Duration of Litigation

In April 1998, Cendant announced past accounting irregularities and stated that its financial statements for certain past years would be restated. 51 F .Supp.2d at 539. On behalf of the Cendant PRIDES class, Kirby filed an Amended and Consolidated Class Action Complaint on November 11, 1998, accompanied by a motion for class certification, a motion for summary judgment, and a motion for preliminary injunctive relief. Less than two months later, on January 7, 1999, the parties announced that they had reached "an agreement in principal[sic]," and the parties presented a proposed settlement agreement to the District Court on March 17, 1999. 51 F.Supp.2d at 540.

As the District Court observed, "[t]his stage of the

_____

18. The District Court did indicate in its opinion that it was using the bid to which Kirby had agreed "as a benchmark of reasonableness" in setting the fee. 51 F.Supp.2d at 541. However , a preliminary bidding process cannot replace subsequent analysis of the factors listed in Gunter. The circumstances and progression of every case are different, and these unique factors must be taken into account by district courts awarding attorneys' fees. Therefor e, though the result of a bidding process may be of use to a district court in awarding fees at the end of the case, it cannot supplant post-settlement analysis to determine a reasonable fee.

21

litigation, notwithstanding that Lead Counsel has moved for summary judgment, is what would be normally the discovery period, very early on in the litigation." 51 F.Supp.2d at 541. The District Court also noted that Kirby spent approximately 5,600 hours on this action.

In setting Kirby's fee award, the District Court apparently turned a blind eye to the following factors: 1) the case was relatively simple in terms of proof, in that Cendant had conceded liability and no risks pertaining to liability or collection were pertinent; 2) the case was settled at a very early stage of the litigation, with an agreement being announced two months after Kirby filed for class certification and a proposed settlement being submitted to the District Court two months after that; 3) ther e was a minimal amount of motion practice in this case--before settlement, Kirby submitted only the Complaint and three motions, all on the same day; 4) discovery was virtually nonexistent--indeed the District Court did not mention any depositions taken or document review conducted by Kirby; and 5) Kirby spent a relatively small amount of time on this case compared to the amount of time expended in most other large class actions.

2. Range of Awards

Before reviewing specific awards in other large class settlements, we will review generally the range of attorneys' fee awards in common fund settlements of class actions. In In re GM Trucks, we observed that "[o]ne court has noted that the fee awards have ranged from nineteen percent to forty-five percent of the settlement fund." 55 F.3d 768, 822 (3d Cir. 1995) (citing In re Smithkline Beckman Corp. Sec. Litig., 751 F. Supp. 525, 533 (E.D. Pa. 1990)). We also noted in In re Prudential that "[t]he district court . . . examined the fee awards in class actions with r ecoveries exceeding $100 million and found the fee per centages ranged from 4.1% to 17.92%." 148 F.3d 283, 339 (3d Cir. 1998).

However, recently two district courts in this Circuit have declined to follow this court's statement of the range in In re Prudential, stating that "the cases cited in [In re

Prudential] were all decided at least thirteen years ago." In re Ikon Office Solutions, Inc. Sec. Litig. , 194 F.R.D. 166, 196 (E.D. Pa. 2000); In re Orthopedic Bone Screw Prod. Liab. Litig., 2000 WL 1622741, at 7 (E.D. Pa. Oct. 23, 2000). Indeed, in another Cendant opinion dealing with attorneys' fees, this same District Court stated that, in cases surveyed by lead counsel, "[a]wards . . . ranged from a low of 20% in the case with a $200 million recovery to a high of 33.3% for cases with recoveries of $77.5 million and $110 million." In re Cendant Corp. Sec. Litig., 109 F .Supp.2d 285, 290 (D.N.J. 2000). These varying ranges of attor neys' fees confirm that a district court may not r ely on a formulaic application of the appropriate range in awar ding fees but must consider the relevant circumstances of the particular case.

One important consideration is the size of the settlement. The Task Force Report stated, with r eference to fee awards in common fund cases: "The negotiated fee, and the procedure for arriving at it, should be left to the court's discretion. In most instances, it will involve a sliding scale dependent upon the ultimate recovery, the expectation being that, absent unusual circumstances, the percentage will decrease as the size of the fund incr eases." 108 F.R.D. 237, 256 (1985). We called attention to this statement in In re Prudential, explaining that "[t]he basis for this inverse relationship is the belief that `[i]n many instances the increase [in recovery] is mer ely a factor of the size of the class and has no direct relationship to the efforts of counsel.' " In re Prudential, 148 F.3d at 339 (quoting In re First Fidelity Bancorporation Sec. Litig., 750 F . Supp. 160, 164 n. 1 (D.N.J. 1990)). Accordingly, district courts setting attorneys' fees in cases involving lar ge settlements must avoid basing their awards on percentages derived from cases where the settlement amounts were much smaller.

3. Other Awards

The District Court did not undertake to review the fees granted in other class action settlement cases, particularly in other large settlement cases, i.e., cases in which the common fund exceeded $100 million.19 Had it conducted

_____

19. A district court in this Circuit noted that "[c]ourts have generally decreased the percentage awarded as the amount recovered increases,

such a review, the District Court should have looked specifically at cases in which the percentage–of–recovery method, not the lodestar method, was employed to set the fee award, and it should have examined the r easoning behind the district courts' fee awards in cases of similar size.

Below, we have set forth a chart of fee awar ds given in federal courts since 1985[20] in class actions in which the settlement fund exceeded $100 million[21] and in which the percentage of recovery method was used. [22] We have

_____

and $100 million seems to be the informal marker of a `very large' settlement." In re Orthopedic Bone Scr ew Prod. Liab. Litig., 2000 WL 1622741, at 7 (E.D. Pa. Oct. 23, 2000).

20. In 1984, the Supreme Court observed in Blum v. Stenson that "[in] the calculation of attorney's fees under the`common fund doctrine,' . . . a reasonable fee is based on a percentage of the fund bestowed on the class." 465 U.S. 886, 900 n.16 (1984). Subsequently, the Third Circuit Task Force Report in 1985 outlined the pr oblems with the lodestar method and recommended that courts use the per centage–of–recovery method instead of the lodestar method in common fund cases. After this instruction from the Supreme Court and the release of the Task Force Report, courts across the country regularly employed the percentage method to set fees in common fund cases.

21. Although we have emphasized the seven–factor analysis required in class action fee cases set forth in Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000), Gunter is not listed in this chart because the settlement in that case was less than $100 million.

22. In several cases, the class settlement exceeded $100 million but the lodestar method was used to determine attor neys' fees. See, e.g., McLendon v. Continental Group, Inc., 872 F. Supp. 142 (D.N.J. 1994) (settlement was for more than $400 million, and lodestar multiplier of 1.5 was used to award attorneys' fees); In re Shell Oil Refinery Litig., 155 F.R.D. 552 (E.D. La. 1993) ($170 million settlement and $31.8 million in fees, which represented a 3.25 lodestar multiplier and approximately 18% of the total settlement); In re W ashington Public Power Supply Sys. Sec. Litig., 779 F. Supp. 1056 (D. Ariz. 1991) ($687 million settlement, $32 million in attorneys' fees, 1.2 lodestar multiplier, and attorneys' fees were 4.7% of total settlement); In r e Baldwin–United Corp. Litig., 1986 WL 12195 (S.D.N.Y. June 27, 1986) ($183.8 million settlement, $7.5 million in attorneys' fees, lodestar multiplier of 2, and fees were 4.1% of total settlement); In re "Agent Orange" Pr od. Liab. Litig., 611 F. Supp. 1296

outlined the amount of settlement, the percentage of the settlement that made up the attorneys' fee award and the lodestar multiplier.

| Case | Settlement | Fees as % of Recovery | Lodestar Multiplier |
|---|---|---|---|
| In re Cendant Corp. PRIDES Litig., 51 F. Supp. 2d 537 (D.N.J. 1999) The instant case under review here. | $341.5 million | 5.7% ($19.3 mil.) | 7-10 |
| In re Cendant Corp. Litig., 109 F.Supp.2d 285 (D.N.J. 2000) | $3.16 billion | 8.275% ($262 mil.) | 32.7 |
| In re Auction Houses Antitrust Litig., 2001 WL 170792 (S.D.N.Y. Feb. 22, 2001) | $512 million | 5.2% ($27 mil.) | Inf. not available |
| In re Orthopedic Bone Screw Prod. Liab. Litig., 2000 WL 1622741 (E.D. Pa. Oct. 23, 2000) | $100 million | 12% | Inf. not available |
| In re Prudential, 106 F.Supp.2d 721 (D.N.J. 2000)23 | $1.8 billion | 5% ($90 mil.) | 2.13 |
| In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166 (E.D. Pa. 2000) | $111 million | 30% | 2.7 |
| Shaw v. Toshiba America Inf. Sys., Inc., 91 F.Supp.2d 942 (E.D. Tex. 2000) | $2.1 billion | 7% ($147 mil.) | Inf. not available |
| In re Sumitomo Copper Litig., 74 F.Supp.2d 393 (S.D.N.Y. 1999) | $116 million | 27.5% ($32 mil.) | 2.5 |

_____

(E.D.N.Y. 1985), aff 'd in part 818 F.2d 226 (2d Cir. 1987) ($180 million settlement, $10.7 million in attorneys' fees, lodestar multiplier of 1.25 to 1.75, and fees were 6% of settlement).

Additionally, it should be noted that the chart includes a substantial number of the post-1985 cases involving large settlements and fees granted as a percentage of the total settlement, but the chart is not comprehensive. We feel that the selection of cases in the chart are representative of the range of cases r elevant to the District Court's analysis of Kirby's fee application in this case.

23. The district court originally awarded attorneys' fees in this case in 1997, see In re Prudential, 962 F . Supp. 572 (D.N.J. 1997), which decision was vacated and remanded by the Thir d Circuit. See In re Prudential, 148 F.3d 283 (3d Cir . 1998). Those decisions are discussed infra.

| Case | Settlement | Fees as % of Recovery | Lodestar Multiplier |
| --- | --- | --- | --- |
| Kurzweil v. Philip Morris Co., 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) | $123.8 million | 30% ($37.1 mil.) | 2.46 |
| In re Lease Oil Antitrust Litig., 186 F.R.D. 403 (S.D. Tex. 1999) | $190 million | 25% | 1.35 |
| In re Copley Pharm., Inc., 1 F.Supp.2d 1407 (D. Wyo. 1998) | $150 million | 13% ($19.5 mil.) | 2 |
| In re PaineWebber Ltd. P'ships Litig. , 999 F. Supp. 719 (S.D.N.Y. 1998) | $200 million | 13% ($25.9 mil.) | 1.4 |
| Walco Investments, Inc. v. Thenen, 975 F. Supp. 1468 (S.D. Fla. 1997) | $141 million | 15% ($21 mil.) | 1.8 |
| In re Combustion Inc., 968 F. Supp. 1116 (W.D. La. 1997) | $127 million | 36% | 2.99 |
| Local 56, United Food & Commercial Workers Union v. Campbell Soup Co., 954 F. Supp. 1000 (D.N.J. 1997) | $114.5 million | 2.8% ($3 mil.) | 2.39 |
| Bowling v. Pfizer, Inc., 922 F. Supp. 1261 (S.D. Ohio 1996), aff 'd 102 F.3d 777 (6th Cir. 1996) | $102.5 million | 10% ($10.2 mil.) | Inf. not available |
| In re Domestic Air Transportation Antitrust Litig., 148 F.R.D. 297 (N.D. Ga. 1993) | $305 million | 5.25% ($14.3 mil.) | Inf. not available |
| In re MGM Grand Hotel Fire Litig., 660 F. Supp. 522 (D. Nev. 1987) | $205 million | 7% | 1–2.95 |

In the charted cases, the attorneys' fee awards ranged from 2.8% to 36% of the total settlement fund. Looking at

the percentage of recovery in this case (5.7%), it appears that it is in line with the other cases and even at the low end of the range. However, a brief review of the facts and posture of these other cases makes clear that, when examined through the seven-factor lens of Gunter, the higher fees awarded in the other cases wer e far more justified than the high award in this case. Accordingly, the District Court should have learned from those cases that extensive time and effort exerted by the attorneys and the existence of complex legal and factual issues warranted higher fee awards than the fee award that would have been appropriate for Kirby.

The district court in In re Auction Houses relied on a pre-settlement bidding process in awarding attorneys' fees. The

26

bidding process in that case differed from the process employed by the District Court in this case, but it raised similar problems. However, regardless of the arguable flaws in the method by which the district court awarded fees in In re Auction Houses, that case was far more complex than the instant case and, as such, is distinguishable. Indeed, the comments of interim lead counsel, excerpted in the district court's opinion, are telling:

> Mr. Furth, on behalf of all of the interim lead counsel, said that he "never in [his] fondest dreams . . . believed that these defendants would pay $512 million" and that this settlement "is the most outstanding result I have ever heard of in the history of the antitrust laws." Another of the interim lead counsel noted that he and his colleagues had been negotiating with defendants prior to the appointment of plaintiffs' lead counsel, that they "had really good hard solid numbers from [defendants], and we didn't think we could have accomplished what Mr. Boies did."

In re Auction Houses Antitrust Litig., 2001 WL 170792, at 6 (S.D.N.Y. Feb. 22, 2001).

In In re Orthopedic Bone Screw, the district court described the case as "nothing less than an uninterrupted, hard-fought, `antagonistic' legal battle," in which the attorneys seeking fees had "conducted substantial, widespread and extensive discovery" including reviewing more than 1,500,000 pages of documents, and had "defended a variety of pleadings and discovery matters and `litigated a plethora of motions,' " which resulted in the court issuing nearly 2,000 Pretrial Orders. 2000 WL 1622741, at 6.

In In re Ikon Office Solutions, the district court granted the 30% fee request because, inter alia, "Counsel expended more than 45,000 hours on this case and paid out expenses of more than $3 million with no guarantee of recovery," the case presented "the legal obstacles of establishing scienter, damages, causation, and the like," and "derivative counsel fees will be taken from this amount." 194 F.R.D. at 194.

27

In Shaw v. Toshiba, the district court noted the protracted schedule of the case, because of which "it has been necessary to prosecute this action continuously, around the clock, seven days a week, workdays and holidays alike." 91 F.Supp.2d at 969. Other factors that made litigation of Shaw difficult included the two million pages of documents reviewed by class counsel, the fact that defendant's corporate headquarters were located in Tokyo, Japan, as well as the additional burden of having to translate many documents and much of the testimony from Japanese to English. Even with these numerous procedural difficulties, the district court only awarded 7% of the settlement in attorneys' fees.

The attorneys in Sumitomo spent mor e than 43,000 hours on the case and inspected 11 million pages of documents, and the case had legal and factual complexities including "the existence and analysis of the relationships between and among more than thirty Comex futures contracts, more than 500 LME contracts, literally hundreds of physical contracts, and millions of tons involved in the copper futures, the copper options and the copper derivative contracts." Sumitomo, 74 F .Supp.2d at 398.

In Kurzweil, the district court noted that, before the settlement, "[t]here had been no lar ge settlements in tobacco litigation generally, and no successful action had yet been brought against a tobacco company based on allegations of addictiveness of nicotine." 1999 WL 1076105, at 1. In addition, the attorneys encountered several obstacles, including that the action was originally dismissed, and the attorneys reviewed millions of documents and tens of thousands of deposition and trial transcripts and conducted numerous depositions. 1999 WL 1076105, at 1.

In In re Lease Oil, the district court explained:

> As well as being novel, this litigation was highly complex and thus required a great deal of lawyering skill. As just explained, the task of simply compiling the evidence was an unusually difficult task, r equiring the assistance of experts and the investment of many hours.24 Also, being novel, the legal issues raised in the litigation required skilled attorneys to handle them.

_____

24. With respect to gathering evidence, the court asserted:

> Godfrey and others had to create their own databases, compiling

28

186 F.R.D. at 445.

The district court in Copley, in granting the 13% fee award, observed that, "[d]uring expedited discovery, class counsel reviewed and analyzed more than 125,000 pages of documents and deposed roughly one hundr ed witnesses." 1 F.Supp.2d at 1408. The case also included 42 days of trial, and class counsel spent 48,794 hours on the case. Finally, the legal questions involved in Copley wer e both novel and complex. As the court explained: "not only was the certification of this class a complex question, but this was also the first and only mass tort class action to go to trial, and the case presented complex medical and scientific issues of causation." 1 F.Supp.2d at 1413.

PaineWebber too had many featur es that would dictate a high fee award. Class counsel conducted "extensive, coordinated discovery," including "coor dinating discovery of hundreds of boxes of documents through the use of sophisticated computer databases, and deposing many key witnesses." 999 F. Supp. at 722. In mor e than two years of litigation, counsel spent "approximately 70,000 hours in heretofore uncompensated legal work in pursuit of factual investigation, drafting of documents, brief writing, document analysis, depositions, trial preparation, settlement negotiation and other tasks." 999 F . Supp. at 723. Finally, the legal issues in PaineW ebber were complex, and class counsel "faced significant substantive and procedural defenses." 999 F. Supp. at 724.

Walco Investments was described by the district court as comprising "four years of bitterly-contested litigation." 975 F. Supp. at 1470. The case involved multiple defendants, and the claims were only loosely related, making class litigation exceedingly complicated, because "claims raised

---

        posted prices, NYMEX prices, transportation costs, grade and weight
        differentials and so forth simply to determine whether or not a
        cause of action might exist. And, in order tofirst articulate their
        claims, class counsel had to hire experts to r esearch their allegation
        that the NYMEX trading center method is a reasonable way of
        determining market price at the lease.

In re Lease Oil, 186 F.R.D. at 445.

against each category of defendants presented separate issues of fact and law and involved differing theories of recovery." 975 F. Supp. at 1471. These circumstances encouraged the court to award 15% in attorneys' fees to attorneys from fourteen different firms representing class plaintiffs.

The action in In re Combustion was eleven years old at the time of settlement and the attorneys had spent over 50,000 hours on the case. In the litigation, there had been "roughly 160 complaints filed, 1140 answers, 1922 motions, with almost 1000 memoranda in support of or in opposition to these motions, 285 depositions . . . , 90 hearings, at least one oral argument per month since the case was removed to federal court, and endless numbers of settlement conferences," as well as "three fairness hearings, the first one lasting one week, and the other two lasting approximately one day each" and "one Daubert hearing lasting a total of two weeks." In re Combustion, 968 F. Supp. at 1136.

In Local 56, the court acknowledged "the complexity of the issues in this case, the significant attendant risks of proceeding with litigation, and the tenacity and vigor with which all counsel represented their clients' interests," in this class action which lasted for four years. 954 F . Supp. at 1005. Even so, class counsel's fees amounted to only 2.8% of the total settlement, a far smaller percentage than the fee awarded to Kirby by the District Court.

In Bowling, the district court averred that "[t]he Court's choice of a percentage . . . will be heavily informed by the value of the services rendered by Counsel." 922 F. Supp. at 1280. The court observed that "Counsel were confronted with myriad complex legal and factual questions in bringing this action and in negotiating the settlement." 922 F. Supp. at 1280.

Domestic Air involved a class action against several airline companies claiming a conspiracy to fix prices. The court observed:

> Counsel negotiated a significant settlement for the class in light of the precarious financial position of most of the defendants and over defendants' insistence

30

that they could not provide a larger cash settlement. Were it not for the considerable skill and effort of plaintiffs' counsel, the action would never have been certified as a class action and members of the class would receive nothing in return for their claims against defendants.

148 F.R.D. 297, 351–52 (N.D. Ga. 1993). In other words, the action in Domestic Air involved fundamental procedural obstacles that could easily have resulted in no recovery at all. Accordingly, class counsel was rewar ded significantly for negotiating such a large settlement.

Finally, in In re MGM Grand Hotel, the court considered "the particular and unique circumstances of this case," including the fact that the attorneys had r ecovered over 6,000 objects from the fire site and had conducted over 1,400 depositions, in granting the 7% fee awar d. 660 F. Supp. at 526.

Indeed, in case after case, the same factors r ecur: complex and/or novel legal issues, extensive discovery, acrimonious litigation, and tens of thousands of hours spent on the case by class counsel. Because none of these factors which increase the complexity of class litigation was present here, it makes sense that the fee awarded in this case should be far lower than those awarded in the charted cases, which fees ranged from 2.8% to 36% of the total settlement.

Also relevant to the District Court's analysis in this case is our holding in In re Prudential r emanding the case to the district court. In that case, we rejected an award of 6.7% of the settlement fund in a case with a fund of $1 billion to $2 billion because the district court had failed to explain adequately why it had applied such a high per centage to the settlement figure and because the court had not explained why the 5.1 lodestar multiplier was justified. We also warned in In re Prudential against overemphasizing counsel's role in recovery, in the context of our criticism of the district court's assumption that counsel had been a catalyst for a plan authored by the Multi–State Life Insurance Task Force, which facilitated the class action settlement in that it established Prudential's liability. We

31

explained that "[a]llowing private counsel to receive fees based on the benefits created by public agencies would undermine the equitable principles which underlie the concept of the common fund, and would create an incentive for plaintiffs attorneys to `minimize the costs of failure . . . by free riding on the monitoring efforts of others.' " In re Prudential, 148 F.3d at 337. Similarly, as we have consistently observed, Cendant's liability and consequent collectability had been conceded at the outset of the PRIDES controversy, and that fact should have been given major consideration by the District Court when setting Kirby's attorneys' fees.

Our review of the lack of complexity of this case and of awards in other large class action settlements, all of which involved more complex issues, more time invested by the attorneys, and, with only a few exceptions, smaller total settlements, leads us to the conclusion that the District Court abused its discretion in granting a 5.7% attorneys' fee award in this case.25

4. Checking Against Lodestar

The District Court's abuse of discretion in this case is magnified when one looks at the lodestar multiplier. As we stated above, "we have . . . suggested that district courts cross-check the percentage award at which they arrive against the `lodestar' award method." Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000); see also In re Prudential, 148 F.3d at 333 (stating that " `it is sensible for a court to use a second method of fee approval to cross check' its initial fee calculation"). Even when the lodestar method is used only as a cross-check,"courts must take care to explain how the application of a multiplier is justified by the facts of a particular case."26 In re Prudential, 148 F.3d at 340–41.

_____

25. We should note that the award actually amounted to more than 5.7% of the total recovery. The fund had a value of $341.5 million, but any unclaimed portion of the fund returned to Cendant. As of August 1999, only 22,502,782 Rights, with a monetary value of $263.5 million, were claimed. Taking this amount as the total r ecovery, Kirby's attorneys' fees
constituted 7.3% of the total fund.
26. We observed in In re GM Trucks that "[t]he Supreme Court . . . has rejected the use of multipliers to enhance the lodestar's hourly rate

In this case, the lodestar multiplier is 7 at a minimum (using Kirby's senior partner rate as the rate for all hours), and the Trust calculates the lodestar multiplier as 10.27 Either of these multipliers (Kirby's multiplier of 7 or the Trust's multiplier of 10) is substantially higher than any of the multipliers in the cases charted above, which range from 1.35 to 2.99, and is also significantly higher than the "large" 5.1 multiplier in In r e Prudential, which we questioned because "the court offer[ed] little explanation as to why a multiplier was necessary or appropriate." 148 F.3d at 340-41. In allowing such a high multiplier in this case without even calculating it, much less explaining how it is justified, the District Court strayed from all responsible discretionary parameters in the awarding of Kirby's attorneys' fees.

In all the cases in which high percentages wer e applied to arrive at attorneys' fees, the courts explained the extensive amount of work that the attorneys had put into the case, and appropriately the lodestar multiplier in those cases never exceeded 2.99. This range is consistent with the principle that " `[m]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.' " In r e Prudential, 148 F.3d 283, 341 (3d Cir. 1998) (quoting 3 Herbert Newber g & Alba Conte, Newberg on Class Actions, S 14.03 at 14-5 (3d ed. 1992)). In this case, the District Court judge made clear that he wanted to reward Kirby for Kirby's quick and beneficial settlement of the case, and that may be a good reason for the fee award to exceed the lodestar, but not to the exclusion of all other factors. On remand of this case to the District Court, we strongly suggest that a lodestar multiplier of 3 (the highest multiplier of the cases reviewed above) is the appropriate ceiling for a fee award, although

_____

amount." 55 F.3d 768, 822 (3d Cir. 1995) (citing City of Burlington v. Dague, 505 U.S. 557 (1992)). However, as stated above, calculation of the lodestar multiplier is still appropriate when used to cross-check the reasonableness of a percentage-of-r ecovery fee award.

27. The Trust calculates the lodestar multiplier as 10 because it assesses the appropriate lodestar fee as $1.9 million, 1/10 of the $19.3 million awarded. (See Trust's Brief at 25-26.)

33

a lower multiplier may be applied in the District Court's discretion. The 3 multiplier would result in an award of no more than $8.3 million for Kirby (calculating the lodestar at $495/hour).

5.

We are seriously troubled by the District Court's award of attorneys' fees constituting 5.7% to 7.3% of the total settlement. As discussed above, this case was neither legally nor factually complex and did not require significant motion practice or discovery by Kirby, and the entir e duration of the case from the filing of the Amended Complaint to the submission of a Settlement Agr eement to the District Court was only four months. Other cases in which higher percentages were awar ded are so dissimilar factually and legally from this case that they cannot be relied upon to support the 5.7% award made in this case. In addition, our discussion and holding in In r e Prudential requires a holding here that the District Court's award was an abuse of its discretion, particularly wher e the District Court appeared to be attributing more r esponsibility to Kirby for the quality of the settlement than may legitimately be warranted. Accordingly, we will vacate the District Court's fee award to Kirby and remand the issue of Kirby's attorneys' fees to the District Court for a more thorough and thoughtful evaluation, including an analysis of, and compliance with, the factors enunciated by us in Gunter and in this opinion.

III.

Finally, the Trust argues that the District Court erred in not granting attorneys' fees to the Trust's attorneys for suggesting a bidding process to choose Lead Counsel and for objecting to Lead Counsel's fee application.

The Second Circuit stated in White v. Auerbach:

> it is well settled that objectors have a valuable and important role to perform in pr eventing collusive or otherwise unfavorable settlements, and that, as the district court recognized, they are entitled to an

34

> allowance as compensation for attorneys' fees and
> expenses where a proper showing has been made that
> the settlement was improved as a result of their efforts.
>
> Ordinarily the trial judge has broad discr etion in
> deciding whether, and in what amount, attor neys' fees
> should be awarded, since he is in the best position to
> determine whether the participation of objectors
> assisted the court and enhanced the recovery.

500 F.2d 822, 828 (2d Cir. 1974).

In this case, the District Court judge exercised his "broad discretion" in finding that the Trust's attorneys had not made the "proper showing . . . that the settlement was improved as a result of their efforts." The District Court judge made clear that he had considered the idea of a bidding process before the Trust's attorneys suggested that procedure, stating: "Walker's opinions have been out there since 1993 at least28 . . . Why do you think that the door was only opened by your key?" (JA 766.) He also asserted that "my last year's clerk and I actually had br ooded this idea of an auction long before you came down the pike." (JA767.)

With respect to the Trust's claim that its attorneys' objections to the fee application resulted in a reduction of the fee award from $34.15 million to appr oximately $19 million, the District Court gave no indication that the objections were the reason for the r eduction and even stated, "if I find that what Mr. Kirby wants is excessive, I'm not dependent upon you . . ." (JA765.) Hence, because the Trust had not demonstrated that it had been r esponsible for the procedure utilized by the District Court or that its actions had resulted in a reduction of Kirby's fees from $34 million to $19 million--findings which are not clearly erroneous--we will sustain the District Court in its rulings on these points.

_____

28. Judge Vaughn Walker actually implemented the bidding process in In re Oracle Sec. Litig. in 1990. 131 F.R.D. 688 (N.D. Cal. 1990). Judge Walker's process differed significantly from the bidding process here in that it was not a sealed-bid process.

35

However, our review of the District Court's attorneys' fee award to Kirby would not have come about had it not been for the Trust's appeal. As the Ninth Cir cuit observed in Zucker v. Occidental Petroleum Corp., to which we have earlier adverted, "[t]he contribution [a particular class member's] attorney made, by providing an adversarial context in which the district court could evaluate the fairness of attorneys' fees, was substantial." 192 F.3d 1323, 1329 (9th Cir. 1999).

Recognizing this fact, that it was the Trust which called our attention to the many aspects of Kirby's fee award which we have discussed and which we have found requires reconsideration by the District Court, we would be remiss if we did not acknowledge this benefit 29 and remand the Trust's claims for its own attorneys' fees to the District Court for reconsideration together with Kirby's fee application. Of course, this will requir e the necessary submissions by the Trust's attorneys to comply with normal fee procedures. Under these circumstances, we think it appropriate for the District Court to evaluate the value of the benefit of the Trust's contribution to the ultimate fee (to be decided by the District Court on remand) and to compensate the Trust to that extent. 30

In so holding, we are fully aware that Cendant had agreed not to contest the award of fees as part of its

_____

29. It bears mention that the Trust's appellate brief urged that Kirby's fees be reduced from $19 million to $7.6 million, (see Appellant's Brief, at 30), a similar figure to the one at which we arrived independently.

30. In its appellate brief, Kirby suggests that the Trust may not have standing to appeal the District Court's denial of the fee request because it was the Trust's counsel, not the Trust itself, that made that request in the District Court. This jurisdictional ar gument, though not without merit, need not concern us for two reasons. First, the District Court's decision denying fees to the Trust's counsel stands insofar as it related to the argument raised by counsel befor e the District Court. We remand the issue of the Trust's counsel's fee r equest to the District Court only with respect to the Trust's effect on the settlement through this appeal. Second, we have repeatedly emphasized in this opinion the importance of the court's role in reviewing counsel's fees in class actions, and we believe this role extends to the District Court hearing a fee application by
the Trust's counsel at this point.

settlement agreement. We also acknowledge that the return to Cendant of any unclaimed rights may well enhance the value of Cendant's rights to its shareholders and rights beneficiaries.

IV.

Although we will not disturb the settlement itself which has not been challenged on appeal, we will vacate the award of attorneys' fees to Kirby and r emand this case to the District Court for a reevaluation of the amount of attorneys' fees, both because the District Court did not adequately explain its reason for the fee awar d and because the fee award does not comply with the r equirements of our jurisprudence. We will also vacate the District Court's order denying attorneys' fees to the Trust and remand for reconsideration in light of the foregoing discussion and opinion.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit