# United States Court of Appeals
## For the First Circuit

---

No. No. 01-1029

EKCO GROUP, INC.,

Plaintiff, Appellee,

v.

THE TRAVELERS INDEMNITY COMPANY OF ILLINOIS,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, Jr., U.S. District Judge]

---

Before

Boudin, Chief Judge,

Torruella, Circuit Judge,

and Barbadoro,* District Judge.

---

William T. Corbett with whom Laura A. Brady, Drinker Biddle
& Shanley LLP, John A. Lassey, Jennifer L. Murphy and Wadleigh,
Starr & Peters, P.L.L.C. were on brief for appellant.
Gordon A. Rehnborg, Jr. with whom Doreen H. Connor and
Wiggin & Nourie, P.A. were on brief for appellee.

---

*Of the District of New Hampshire, sitting by designation.

BOUDIN, Chief Judge.  This case presents, once again, see Liberty Mut. Ins. Co. v. Metro. Life Ins. Co., 260 F.3d 54 (1st Cir. 2001), the vexing question of how to interpret an "advertising injury" clause in a general commercial liability ("GCL") policy.  EKCO Housewares, Inc., a subsidiary of EKCO Group, Inc. (collectively "the EKCO companies"), markets kitchen products, some of which it makes itself.  Among its products are metal tea kettles, which are sold to K-Mart, a large, independent chain of retail stores.  In 1998, Chantal Cookware Corporation of Houston, Texas, brought suit in federal court in Texas against EKCO Housewares, K-Mart and others.  Chantal Cookware Corp. v. Vitrex Gourmet Corp., No. H-97-3978 (S.D. Tex. 1998).

The complaint in the Chantal case, as ultimately amended, charged that the EKCO tea kettle (its "Royale" 2.5 quart kettle) resembled in design and ornament Chantal's best selling tea kettle (its "Classic" 2.5 quart kettle) and that the defendants were  liable for trade dress infringement and unfair competition under both the Lanham Act, 15 U.S.C. § 1125(a) (1994), and state law, and for infringement of a design patent

covering Chantal's kettle, 35 U.S.C. § 271 (1994 & Supp. V 1999). Chantal said that EKCO had deliberately copied the well known design, features, and packaging of Chantal's tea kettle, that the EKCO version was a low quality replica, and that the production and sale of the EKCO tea kettle had damaged Chantal.

Travelers Indemnity Company of Illinois ("Travelers") had insured EKCO Group and EKCO Housewares under GCL policies covering successive time periods from 1993 to 1997. The EKCO companies notified Travelers of the <u>Chantal</u> lawsuit, asserting that Travelers was obligated to defend and indemnify. Although the Travelers policies provided various coverages, the provision invoked by the EKCO companies insured them against liability for, and promised to defend suits based upon, "advertising injury caused by an offense committed in the course of advertising your goods, products or services." This coverage was subject to several limitations. The policy defined the phrase "advertising injury" as follows:

> 1. "Advertising injury" means injury arising out of one or more of the following offenses:
>
>> a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

> b. Oral or written publication
> of material that violates a
> person's right of privacy;
>
> c. Misappropriation of
> advertising ideas or style of
> doing business; or
>
> d. Infringement of copyright,
> title or slogan.

Travelers refused to defend, and the EKCO companies thereupon brought suit against Travelers in New Hampshire state court seeking a declaration that Travelers was obligated to defend the <u>Chantal</u> lawsuit. EKCO Group, which had purchased the policies for itself and affiliated companies, has ties with New Hampshire. Travelers removed the case to federal district court in New Hampshire, claiming jurisdiction based on diversity of citizenship. 28 U.S.C. § 1332. Thereafter, the <u>Chantal</u> lawsuit was settled. The EKCO companies hope to recover their defense costs and amounts paid in settlement.

In the federal action, both sides moved for summary judgment, and on November 29, 2000, the district court filed a decision in favor of the EKCO companies. Applying New Hampshire law to construction of the policy, the district court held <u>inter alia</u> that the trade dress and unfair competition claims made by Chantal against EKCO Housewares fell within the policy coverage for advertising injury, that the injuries were caused by an

offense committed in the course of advertising EKCO's goods, and that certain exclusions relied upon by Travelers did not apply.

Travelers appealed to this court. Thereafter, the EKCO companies filed a motion, joined by Travelers, to dismiss EKCO Housewares as a party-plaintiff; the purpose was to preserve federal jurisdiction, it having become clear belatedly that EKCO Housewares, like Travelers, is an Illinois corporation. EKCO Group is a proper plaintiff, having contracted for the policies in question, and both sides have stipulated that rulings as to EKCO Group's rights will control as to EKCO Housewares despite its dismissal. Precedent permits us to grant the requested motion, Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 833 (1989), and we now do so.

Turning to the merits, we note that the parties agree that New Hampshire law controls the interpretation of the policies. This position is colorable (EKCO Group had its main office there when it contracted for coverage), so we accept it, Merchants Ins. Co. of N.H., Inc. v. U.S. Fid. & Guar. Co., 143 F.3d 5, 8 (1st Cir. 1998), observing that the pertinent precepts of New Hampshire law appear much like those of other states. Because the interpretation of the insurance policy in this case presents a question of law, see Ross v. Home Ins. Co., 773 A.2d

654, 656 (N.H. 2001), we review the district court's ruling and construe the policy <u>de novo</u>.

Needless to say, the advertising injury provision is, at least in certain applications, unclear and has provoked a good deal of litigation.  <u>E.g.</u>, <u>Liberty</u>, 260 F.3d at 54.  New Hampshire, like most states, tends to favor the insured where the policy is genuinely ambiguous and the choice is between two plausible readings, one providing coverage and the other not. <u>Fed. Bake Shop</u> v. <u>Farmington Cas. Co.</u>, 736 A.2d 459, 460 (N.H. 1999).  But plausibility is a matter of degree, and a policy may be unclear in some respects and clear enough in others.

In this case, under the plain terms of the policy there is coverage only if two different conditions are satisfied. <u>First</u>, there must be injury "arising out of" a <u>defined</u> offense; here the only listed offense claimed by EKCO Group to be applicable is "[m]isappropriation of advertising ideas or style of doing business."  <u>Second</u>, the offense in question "must be committed in the course of advertising your [the insured's] goods, products or services."  As we shall see, the two provisions cannot be construed wholly in isolation from one another.

It is by no means impossible, by piecing together dictionary definitions, to read the policy language in question

to provide coverage here for the EKCO companies. This is easiest to do (and most defensible) for the first part of the pertinent offense definition--the term "misappropriation"-- although even here the coverage might be debated. This is so because it is not easy to match Chantal's claims to whatever remains of the evanescent common law tort so labeled (EKCO does not even try), and it is uncertain whether the policy used the term in a generic sense.

There is no general common law rule against using the ideas, inventions and practices of others, absent deception or wrongful acquisition. See Prosser & Keeton on Torts 1020-22 (5th ed. 1984). Rather, the label "misappropriation" has been used to describe a judicially created tort where, in narrow categories or for special reasons, common law protection has been given to a few intangibles.[1] Chantal's design patent claim is statutory, and its trade dress claim would more commonly be described in common-law jargon as "passing off," "trademark" or "unfair competition."

---

[1]The classic case is Int'l News Serv. v. Assoc. Press, 748 U.S. 215 (1918), now obsolete as a federal doctrine but possibly still available under state law in unusual cases. Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 845 (2d Cir. 1997). Restatement (Third) of Unfair Competition § 38 cmt. c, at 412 (1995); id. reporters' note cmts. a and b. The original Restatement of Torts did not use the term, and the Restatement of Unfair Competition uses it only generically to encompass trade secret law and right of publicity.

Alternatively, the policy reference to misappropriation might be read not as a technical legal reference but generically to include any tort, statutory or otherwise, for which wrongful acquisition is an element. Both trade dress and design patent suits are based in part on wrongful appropriation in this latter sense. If everything turned on the reference to "misappropriation," the canon that policies be construed in favor of the insured might resolve the case for EKCO, Fed. Bake Shop, 736 A.2d at 460, although this is not a foregone conclusion.[2]

The other part of the offense definition--that the misappropriation be of an advertising idea or style of doing business--is harder to satisfy, but perhaps not linguistically impossible. To call a real teapot intended for sale as a kitchen utensil an "advertising idea" is not a natural usage: the phrase refers more readily to an advertising concept or plan for an advertising campaign (both of which could indeed be

---

[2]Other circuits have viewed the omission of specific references (e.g., to trademark) as precluding coverage. Callas Enters., Inc. v. Travelers Indem. Co. of Am., 193 F.3d 952, 956-57 (8th Cir. 1999); ShoLodge, Inc. v. Travelers Indem. Co. of Ill., 168 F.3d 256, 260 (6th Cir. 1999); Advance Watch Co., Ltd v. Kemper Nat'l Ins. Co., 99 F.3d 795, 806 (6th Cir. 1996) (product itself not "advertising"). See also Curtis-Universal v. Sheboygan Emergency Med. Serv., Inc., 43 F.3d 1119, 1123 (7th Cir. 1994) (refusing to construe "unfair competition" in its broadest sense in predecessor policy).

misappropriated).  And "style of doing business" seems even more remote to the teapot; the phrase is commonly used, in the legal context, to refer to a theme or motif of packaging of products or of the business venue itself, such as the Mexican restaurant decor involved in Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763 (1992).

Still, a distinctively designed teapot could, assuming secondary meaning, be seen as both a concrete product and as an insignia triggering a favorable association in the public's mind with the manufacturer, just as an ordinary trademark device or name might do.  I.P. Lund Trading ApS & Kronin, Inc. v. Kohler Co., 163 F.3d 27, 51-52 (1st Cir. 1998) (concurring opinion). To this extent the physical teapot itself might be deemed to function as an "advertising idea" for Chantal.  The district court took this view and then, by a kind of substitution, deemed EKCO Housewares's  production and sale of the same teapot to satisfy the other requirement of the policy--that the misappropriation be "committed in the course of advertising your [EKCO's] goods, products or services."

This approach to construing the policy presents three problems.  The first is that it requires  one to read at least some of the policy language unnaturally.  Yes, EKCO's production and sale of the teapot could be described as "advertising . . .

[EKCO's teapot]" in at least two different senses: in the technical sense that the teapot itself might--assuming secondary meaning, <u>Wal-Mart Stores, Inc.</u> v. <u>Samara Bros., Inc.</u>, 529 U.S. 205, 216 (2000)--falsely suggest that Chantal was the source, and in the banal sense that every product displayed or depicted is an advertisement for itself and its obvious features.  But to describe this case of product copying as a case about <u>EKCO's advertising</u> is surely a very strained way to speak.

Although the term "advertising" has a  range of meanings,  the one that leaps to mind in reading this policy is what is surely the most common use: as a reference to advertising in newspaper, radio, television or other familiar media where the advertisement is an activity or item distinct from the product being advertised.  This is so even though, as the district court pointed out, the dictionary also permits the term "advertising" to be used, with equal legitimacy in the eyes of lexicographers, to mean any form of "calling public attention" to something else (<u>e.g.</u>, her tan was an advertisement for summer vacations; his athletic ability, for vigorous exercise, etc.).[3]

---

[3]<u>The Random House Dictionary of the English Language</u> 29 (2d ed. 1987) ("The act or practice of calling public attention to one's product . . . esp. by paid announcement in  newspapers, over radio or television, on billboards, etc."); <u>The American Heritage Dictionary</u> 82 (2d ed. 1992) ("The action of attracting

The second problem with the approach in this case is that it is a slippery slope to unacceptable outcomes. Imagine that Chantal's claim was not for trade dress but solely based on a design or utility patent, say, because EKCO had copied a Chantal electric tea kettle shaped like a furnace that boiled water in 15 seconds. Certainly, the EKCO tea kettle itself could still be described as "advertising"--in the "calling public attention to" sense--its own evocative design or technical prowess; but linguistic awkwardness aside, surely no one imagines that a policy covering "advertising injury" was intended to provide coverage for ordinary patent violations. See St. Paul Fire & Marine Ins. Co. v. Advanced Intercontinental Sys., Inc., 824 F. Supp. 583, 586 (E.D. Va. 1993), aff'd, 21 F.3d 424 (4th Cir. 1994).

Coverage on the present facts requires that one stretch the term "advertising" in a way that has no natural stopping point short of absurd results. The obvious remedy is to read the term both in the coverage and definitional provisions to refer to conventional advertising--something separate from the product--which also happens to be the term's most familiar usage. So to restrict the term does not banish every

public attention to a product or business."); Black's Law Dictionary 55 (7th ed. 1999) ("The action of drawing the public's attention to something to promote its sale.").

-11-

uncertainty--such as whether a one-off prospectus or a salesman's oral pitch is "advertising," see Liberty, 260 F.3d at 64-66--but does avoid impossible applications.

Finally, this narrower reading coheres with other language in the same two provisions--the coverage and definitional paragraphs. To speak of "the course of advertising your goods" suggests some distinction between producing and selling the goods on the one hand and "advertising" them on the other; and all of the definitions of covered offenses apart from "misappropriation" make clear (in two cases) or imply (in the last) that the drafter had in mind something akin to conventional advertising ("oral or written publication of material" causing libel or invasion of privacy; infringement of copyright, title, or slogan).

In the end, we are left to choose between two different concepts of "advertising": the familiar bundle of business activities associated with that term and the far broader concept of inviting public attention, deliberately or not and by any means. Although the bare language of the policy is not conclusive, the more natural reading and the only one that avoids outlandish results is the former. It is worth adding that if the latter, open-ended definition were employed, it is

hard to see how an insurer could even begin to calculate risks and set premiums.

Problems of application arise in insurance cases about which neither side has ever thought. And in those cases, if the policy language is unclear, the answer is not automatically to include or exclude but instead to use the "construe against" canon to help choose among reasonable readings. Taking this policy as a whole, only the conventional reading of the term "advertising" is reasonable, even if it too is blurred at the edges.

On appeal, EKCO says briefly that it did advertise the Royale in the conventional sense as well: it depicted its teapot, for example, in a printed brochure and in its 1997 annual report. But here EKCO has shifted ground as to just what it regards as the "misappropriation" charged by Chantal and ignored the policy requirement that the defined offense--here, allegedly misappropriation of advertising ideas or style of doing business--be "committed in the course of advertising [EKCO's] goods . . . ." Put differently, there must be some causal connection running from the offense through the advertising to the injury.[4]

---

[4]<u>Bank of the West</u> v. <u>Superior Court of Contra Costa County</u>, 833 P.2d 545, 558-59 (Cal. 1992) (en banc) (collecting cases); <u>Lazzara Oil Co.</u> v. <u>Columbia Cas. Co.</u>, 683 F. Supp. 777, 780

Nothing in the Chantal complaint suggests that it was concerned with EKCO's design of its brochures or annual reports or that the graphics or typography were invented by or borrowed from Chantal. The misappropriation offenses charged by Chantal in its complaint were the physical reproduction and sale of a look-alike teapot by EKCO. That physical reproduction and sale were not done "in the course of" making brochures or annual reports. The latter is advertising, to be sure, but not where the offenses charged by Chantal occurred.

In 1998--after the events in this case--the insurer organization that drafts standard form language for insurers to use altered the provisions that relate to advertising injury. See generally In re Ins. Antitrust Litig., 938 F.2d 919 (9th Cir. 1991). The new language (which Travelers may or may not have adopted) does provide coverage for infringement of trade dress in "your advertisement" as well as copyright violation or misappropriation in advertising; but the changed language also expressly defines "advertisement" as "a notice that is broadcast

_____

(M.D. Fla. 1988), aff'd, 868 F.2d 1274 (11th Cir. 1989); A. Meyers & Sons Corp. v. Zurich Am. Ins. Group, 545 N.E.2d 1206, 1209 (N.Y. 1989). But see John Deere Ins. Co. v. Shamrock Indus., Inc., 696 F. Supp. 434, 440 (D. Minn. 1988), aff'd, 929 F.2d 413 (8th Cir. 1991).

-14-

or published to the general public or specific market segments about your good, products, or services . . . ."[5]

EKCO mentions this 1998 change, suggesting that the narrowed definition contrasts with the prior language. Where a defendant in a trip-and-fall case makes expensive repairs to the premises before trial, it may or may not (depending on circumstances) be reasonable to infer that the defendant thought the prior state of the premises unsafe (although doubt about the strength of this inference is one reason why such evidence may be barred, see Fed. R. Evid. 407 & advisory committee's notes.) But expression can always be made clearer and to change language in a policy is simply a precaution against recurrent misunderstanding.

We have not discussed the case law at any length because there are no New Hampshire cases directly in point and those from other courts are divided.[6] It is true that the two

---

[5]Insurance Service Office, Inc., Commercial General Liability Coverage Form (1999) CG 00 01 07 98, § 5, reprinted in 1 International Risk Management Institute, Inc., Commercial Liability Insurance, IV.T.150 (Supp. 2001)

[6]Compare Bay Elec. Supply, Inc. v. Travelers Lloyds Ins. Co., 61 F. Supp. 2d 611, 617 (S.D. Tex. 1999), and Am. Employers' Ins. Co. v. DeLorme Publ'g. Co., 72 F. Supp. 2d 64, 75-76 (D. Me. 1999), with Callas, 193 F.3d at 952, and Advance Watch, 99 F.3d at 802-07. The only New Hampshire Supreme Court case we could find construing the advertising injury provisions is not directly in point, although it did not adopt a particularly generous reading. First Bank & Trust Co. v. New

-15-

circuit courts construing such policies favor Travelers, <u>see</u> note 1, above, but their reasoning is different from our own. In particular, the Sixth Circuit's categorical approach in <u>Sho Lodge</u>, 168 F.3d at 260, might seem to exclude any possibility of advertising injury based on a trademark or trade dress violation. By contrast, we can ourselves imagine a possible claim if, in the course of a published advertisement, a rival's trademarked insignia were misappropriated.

There are a host of difficult questions that the policy, at least in its present form, could present. What happens when there is conventional advertising in an unconventional medium (<u>e.g.</u>, an advertisement for some other product on t-shirts or ballpoint pens); and how should one analyze a claim directed to the appearance of a pirated trademark depicted in a newspaper advertisement where the harm flows directly from the publication? Such variations, however, need not be addressed in order to resolve the present case.

The motion to dismiss EKCO Housewares is <u>granted</u>, and the judgment of the district court is <u>reversed</u> and the case remanded for further proceedings consistent with this opinion. That our own view differs from the very thoughtful opinion of the district judge in this case merely underscores that the

<u>Hampshire Ins. Group</u>, 469 A.2d 1367 (N.H. 1983).

issue is a difficult one, which we are obliged to decide <u>de novo</u>.

<u>It is so ordered.</u>