# United States Court of Appeals
## For the First Circuit

No. 01-2342

OPEN SOFTWARE FOUNDATION, INC., and HEWLETT PACKARD COMPANY
Plaintiffs, Appellants,

v.

UNITED STATES FIDELITY AND GUARANTY CO.,
Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, U.S. District Judge]

Before

Torruella and Lipez, Circuit Judges,
and Schwarzer, Senior District Judge.*

Eric R. Little, with whom David A. Gauntlett, Gauntlett & Associates, Stephen G. Hennessy, and Corcoran, Fitzgerald & Hennessy, LLC were on brief, for appellants.

David M. Ostrander, with whom James S. Greenan, Greenan, Peffer, Sallander & Lally, LLP, John Graceffa, and Morrison, Mahoney & Miller were on brief, for appellee.

October 4, 2002

_____

*Of the Northern District of California, sitting by designation.

**LIPEZ**, **Circuit Judge**. Plaintiffs Open Software Foundation (OSF) and Hewlett-Packard (HP) brought this diversity action against USF&G, their general commercial liability insurer, claiming that USF&G had a duty to defend a lawsuit filed against them by Addamax Corporation, a software manufacturer.[1] After OSF decided not to bundle Addamax security software into its UNIX-based operating system, Addamax sued OSF in 1989, alleging that it was a price-fixing purchasing pool. The litigation continued until 1998, when we affirmed Judge Tauro's grant of summary judgment to OSF. See Addamax v. Open Software Foundation, 152 F.3d 48 (1st Cir. 1998). OSF's general commercial liability policy with USF&G obliged the insurance company to indemnify OSF for liability incurred in suits based on a range of activities classified, inter alia, as "personal injury" or "advertising injury".

We agree with the district court that Addamax's complaints, read in conjunction with all relevant extrinsic evidence cited by OSF, neither stated nor adumbrated a claim for damages resulting from a "personal injury" or "advertising injury" defined in the policies. Consequently, we conclude that USF&G had no duty to defend the Addamax litigation, and we affirm the decision of the district court granting summary judgment to USF&G.

---

[1]Both OSF and Hewlett-Packard (HP), one of OSF's sponsors, filed this action against USF&G. USF&G claims that HP should not be permitted to sue because it failed to tender the claim to USF&G in a timely fashion. In light of our determination that OSF's claims lack merit, HP's identical claims against OSF must necessarily fail as well. Therefore, we need not address the question of whether HP properly brought suit. For the sake of convenience, we refer to the plaintiffs as OSF.

## I. Background

Organized in 1988 by seven computer hardware and software companies (the "sponsors"), pursuant to the National Cooperative Research Act of 1984, 15 U.S.C. §§ 4301-05 (1993), OSF was tasked with designing and marketing a UNIX-based operating system known as OSF/1 that would become an industry standard for UNIX users. To induce other companies to develop components for its operating system, OSF formulated various "requests for technology" (RFTs), which essentially offered competing suppliers the opportunity to submit their products to be integrated into the OSF/1 operating system.

One necessary component of the operating system was security software. In November, 1989, OSF solicited two software developers, Addamax Corporation (Addamax) and Secureware, to submit their security technologies for evaluation. Roughly one year later, OSF selected Secureware's security technology to be incorporated into OSF/1.

In April, 1990, Addamax's counsel sent a demand letter to OSF claiming that its decision to "bundle" Secureware software into OSF/1 violated federal and state antitrust laws, and threatening litigation if the alleged violations were not remedied. When OSF failed to respond to these demands, Addamax filed a complaint against OSF and two of its sponsors, Hewlett-Packard and Digital Electric Corporation. Addamax alleged that the sponsors and members of OSF were a "buyers' cartel" that conspired to coerce software makers into offering their products to OSF at prices below

fair market value.[2]  The complaint summarized Addamax's claims as follows:

> This is an action to recover damages and obtain permanent injunctive relief against the Open Software Foundation, Inc. ("OSF"), Digital Equipment Corporation ("DEC"), and Hewlett-Packard Company ("H-P") for violations of federal and state antitrust laws, unfair trade practice law, and the common law of the Commonwealth of Massachusetts . . . . OSF acts as an illegal cartel through which its Sponsors . . . have illegally combined, contracted, or conspired to exercise their aggregate market power by, among other things, fixing prices for the software technology OSF acquires from software developers; setting a price ceiling in certain software markets; allocating product markets among the Sponsors; and boycotting certain independent software developers, including [Addamax].  The net effect, among others, of the defendants' activities has been and will be to unlawfully and unreasonably restrain trade, substantially lessen competition among purchasers of software, drive independent software developers out of business, and reinforce the strong market positions of OSF and its Sponsors.

Of the nine counts in the complaint, the first seven were based on federal or state antitrust statutes.  The eighth count alleged that OSF's operations constituted "unfair methods of competition and unfair or deceptive acts or practices" in violation of Mass. Gen. Laws ch. 93A, §§ 2 and 11 ("Chapter 93A").  The ninth count alleged that OSF and its sponsors "intentionally and improperly interfered

---

[2]An unabridged account of the claims and their  disposition may be found in the opinions Addamax v. Open Software Found., 964 F. Supp. 549 (D. Mass. 1997), and Addamax v. Open Software Found., 152 F.3d 48 (1st Cir. 1998).  The district court's decision in this case provides a concise summary of these two cases.  See Open Software Found., Inc. and Hewlett-Packard Corp. v. United States Fid. and Guar. Co., 2001 WL 1298878 (D. Mass. 2001).

with Addamax's actual contractual relations and prospective contractual relations." Approximately two years after filing its original complaint, Addamax filed an amended complaint to include, inter alia, more detailed allegations describing and illustrating OSF's practice of coercing independent software vendors to license their products at below-market prices.[3]

OSF and HP successfully defended the Addamax suit. We "found that antitrust violations, even if they were assumed to have occurred, were not a material cause of Addamax's failure in the line of business at issue," and accordingly affirmed the district court's grant of summary judgment to OSF. Addamax Corp. v. Open Software Found., 152 F.3d 48, 50 (1st Cir. 1998).

Anticipating the costs of defending the Addamax suit, OSF's corporate counsel sent a letter to USF&G on March 5, 1992, requesting that they defend the claim pursuant to the primary and excess liability policies issued by USF&G. In a memorandum appended to the letter, OSF's associate general counsel, Sue Schlener, argued that the Addamax claims were covered by OSF's policy with USF&G under the "advertising injury" or "personal injury" clauses of the policies. After consulting outside counsel, USF&G notified OSF on August 25, 1992, that it did not consider any

---

[3]Under Massachusetts law, allegations contained in any version of the complaint may trigger an insurer's duty to defend. See Lumbermen's Mut. Cas. Co. v. Belleville Indus., Inc., 555 N.E.2d 568, 575 (Mass. 1990) ("[U]ntil there is an unalterable determination as to the nature of the underlying claim, any declaration of rights concerning the insurer's duty to defend cannot be conclusive."). Accordingly, we use the term "complaints" in our discussion of the case to refer collectively to Addamax's original complaint and first amended complaint.

of the claims to fall within the coverage furnished by the primary and excess liability policies, and therefore declined to accept tender of the defense.

Approximately six years later, OSF filed this lawsuit against USF&G while Addamax's appeal in the underlying action was still pending before this court. Claiming that USF&G had a duty to defend the Addamax claim, OSF requested a declaratory judgment to this effect as well as damages in the amount of reasonable defense costs. OSF specifically contended that Addamax's suit alluded to "personal injuries," including defamation, and "advertising injuries," including unfair competition; and asserted that since both types of claims were listed in USF&G's general and excess liability policies, USF&G had a duty to defend. In a thoughtful opinion, the district court found both arguments unpersuasive and granted USF&G's motion for summary judgment. OSF appeals, arguing that both the personal injury and advertising injury clauses of the GCL triggered a duty to defend.

## II. Interpreting the Policies

Like most other jurisdictions, Massachusetts imposes a broad duty to defend on insurers: "[i]t is axiomatic that an insurance company's duty to defend is broader than its duty to indemnify." Boston Symphony Orchestra v. Commercial Union Ins. Co., 545 N.E.2d 1156, 1158 (Mass. 1989). The Supreme Judicial Court (SJC) has observed that the duty to defend "is based on the facts alleged in the complaint and those facts which are known by the

insurer." Boston Symphony, 545 N.E.2d at 1158. Thus, the insurer must accept tender of a defense if the complaints state or adumbrate[4] a covered claim when read in light of extrinsic facts[5] bearing some relevance to the allegations that the plaintiff did not specifically include in the complaint, but were nonetheless known or readily knowable by the insurer when the defense was tendered:

> [T]he question of the initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions: if the allegations of the complaint are "reasonably susceptible" of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense. . . . Otherwise stated, the process is one of envisaging what kinds of losses may be proved as lying within the range of allegations of the complaint, and then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy.

Continental Cas. Co. v. Gilbane Bldg. Co., 461 N.E.2d 209, 212 (Mass. 1984) (quoting Sterilite Corp. v. Continental Cas. Co., 458 N.E.2d 338, 340-41 (Mass. 1984) (citations and footnote omitted)).

---

[4]We follow the district court in defining "to adumbrate" to mean "'to give a sketchy representation of; outline broadly, omitting details (there was only time to adumbrate the plan)' or 'to suggest, indicate, or disclose partially and with a purposeful avoidance of precision (the meaning of the poem is adumbrated in its title).'" OSF, 2001 WL at *3 n.1 (quoting 1 Webster's Third New International Dictionary 30 (1981)); see also Random House Webster's College Dictionary 19 (1992) (defining adumbrate to mean "to give a faint image or indication of; outline or sketch").

[5]When the parties refer to "extrinsic facts," which they often do, we understand them to mean facts not referenced within the complaint.

Determining whether complaints "adumbrate" a claim can be a difficult interpretive exercise. OSF and USF&G advance widely varying accounts of how the court, applying Massachusetts law, is to analyze the complaints and facts extrinsic to them when "envisaging what kinds of losses may be proved as lying within the range of allegations of the complaint." Continental Cas. Co., 458 N.E.2d at 212. USF&G argues that "even if facts exist extrinsic to the complaint which, if they were pleaded, would trigger coverage . . . [t]here is no duty to defend" if the "allegations of the complaint are unambiguously outside the scope of policy coverage." OSF rejects this characterization of Massachusetts law and largely rests its case on the proposition that USF&G had a duty to defend OSF because Addamax could have sued for a covered personal or advertising injury on the basis of facts outside the complaints that were "known or readily knowable by the insurer." State Mutual Life Assurance Co. v. Lumbermen's Mutual Casualty Co., 874 F. Supp. 451, 456 (D. Mass. 1995).

Massachusetts courts generally use extrinsic facts (such as those set forth in demand letters to the insurer) to aid interpretation of the complaint, and not as independent factual predicates for a duty to defend. In attempting to "envisag[e] what kinds of losses may be proved as lying within the range of allegations of the complaint," the insurer must examine the plaintiff's allegations in conjunction with facts that it knows or readily should know in order to determine whether coverage exists under the policy. Boston Symphony, 545 N.E.2d at 1158, 1160.

-8-

However, the insured cannot, "in the absence of a complaint that requires coverage, force its insurer to defend the insured by simply telling the insurer facts that would create coverage." Id. at 1160; see also Kilgore v. Resumix, 1998 Mass.Super. LEXIS 170 (finding no duty to defend where defamatory utterance was neither alleged nor implied, and amendment of the complaint to state a defamation claim was a mere possibility).

The language of Boston Symphony undercuts OSF's position that facts extrinsic to the plaintiff's allegations in the complaints, uncovered at any stage of the underlying action, can independently trigger a duty to defend that does not arise from the allegations of the complaints, however sketchily stated. Indeed, the SJC envisioned a limited role for extrinsic facts in liability insurance cases: "We hold only that an insurer must give consideration to facts outside the complaint when it considers the allegations in the complaint to determine if coverage exists." Boston Symphony, 874 F. Supp. at 456. This holding is consistent with prior Massachusetts decisions emphasizing that "there is no duty to defend if, at the time the claims were advanced, the insurer could reasonably have concluded that no aspect of the claims . . . fell within the scope of coverage." Millipore Corp. v. Travelers Indem. Co., 115 F.3d 21, 35 (1st Cir. 1997) (citing Polaroid Corp. v. Travelers Indem. Co., 610 N.E.2d 912, 916 (Mass. 1993)) (emphasis added). Thus, while the insurer can generally determine its duty to defend after the plaintiff submits the initial version of his complaint, the duty to defend may

occasionally arise during a later phase in the underlying action if the plaintiff obtains leave to amend and adds allegations that trigger coverage. Consequently, "until there is an unalterable determination as to the nature of the underlying claim, any declaration of rights concerning the insurer's duty to defend cannot be conclusive." Lumbermen's Mut. Cas. Co. v. Belleville Indus., Inc., 555 N.E.2d 568, 575 (Mass. 1990).

We therefore treat the extrinsic facts known or readily knowable to USF&G as an aid to interpreting the Addamax complaints. We do not consider them as independent grounds for a duty to defend. Functioning in this limited role, extrinsic facts work in tandem with the "adumbrate" standard to add substance and meaning to skeletal claims only adumbrated in the complaint. These facts, brought to the insurer's attention in a timely fashion by the insured, aid the insurer's informed review of the tender of defense by painting a fuller picture of the underlying action.

However, extrinsic facts can also be misused by insureds seeking to transform a skeletal claim in the underlying complaint into an allegation arguably covered by the liability policy but unrelated to an actual claim in the complaint. Employed in this way, extrinsic facts could stretch the terms of the liability policy to encompass lawsuits beyond the contemplation of the parties when they contracted for the insurance. Hence, we must be mindful of the SJC's admonition in Boston Symphony that the insured cannot, "in the absence of a complaint that requires coverage, force its insurers to defend the insured by simply telling the

-10-

insurer facts that would create coverage." Boston Symphony, 545 N.E.2d at 1160.

We now discuss each of the two contested clauses of the policies in turn.

### III. Advertising Injury

OSF argues that Addamax's suit was covered under the "advertising injury" provisions of the primary and excess insurance policies in effect at the time of OSF's announcement of the selection of Secureware. The pivotal definition in the Primary Policy reads as follows:

> "Advertising Injury" means injury arising out of an offense committed during the policy period occurring in the course of the named insured's advertising activities, if such injury arises out of libel, slander, defamation, violation of right of privacy, piracy, unfair competition, or infringement of copyright, title or slogan.

The Umbrella Policy providing excess coverage similarly covers damages resulting from:

> Advertising injury--mean[ing] injury arising out of one or more of the following acts committed during the policy period by or for the Named Insured in any advertisement, publicity article, broadcast or telecast:
> (a)  libel, slander or defamation;
> (b)  infringement of copyright or of title or of slogan;
> (c)  piracy  or  unfair  competition  or  idea misappropriation under an implied contract;
> (d)  invasion of the right of privacy.

Of all the acts listed in the advertising injury provisions of the two policies, only "unfair competition" is

-11-

invoked by OSF as an underlying cause of the advertising injuries adumbrated in the Addamax complaints.  In interpreting the phrase "unfair competition," we note that courts are generally obliged to construe ambiguous terms in an insurance contract in favor of the insured.  See Kenneth H. York & John W. Whelan, Insurance Law 41, 42 (2d ed. 1988) (discussing the doctrine of contra proferentum); Mass. Bay Transp. Auth. v. Allianz Ins. Co., 597 N.E.2d 439 (Mass. 1992) (recognizing the doctrine in Massachusetts law).  Yet this rule does not operate here because the phrase "unfair competition" as used in the USF&G policies is not ambiguous.  See Mass. Bay Transp. Auth., 597 N.E.2d at 441 (declining to follow the doctrine of contra proferentum because the relevant policy language was not ambiguous).  As the district court found, the term "unfair competition" in the policies "refer[s] to conduct that causes confusion on the part of consumers," such as palming off or passing off.  OSF, 2001 WL 1298878 at *6; see also American Bar Association Section of Litigation, Model Jury Instructions: Business Torts Litigation § 4.01[3] (1996).  It is settled in Massachusetts that "the gravamen of an unfair competition claim is the likelihood of consumer confusion as to the source of the goods or services." Datacomm Interface, Inc. v. Computerworld, Inc., 489 N.E.2d 185, 191 (Mass. 1986).[6]

---

[6]OSF argues that the "multiple reasonable meanings for the 'unfair competition' offense which have long been known to insurers evidence that the term is . . . ambiguous," and cites New Castle County, Delaware v. Nat'l Union Fire Ins. Co., 243 F.3d 742, 745 (7th Cir. 2001) (observing that this "single phrase, which

Given the well-settled meaning of the term "unfair competition" in Massachusetts law, the leading case in the Commonwealth interpreting the phrase "unfair competition" in a general commercial liability insurance policy not surprisingly limits the injury to "palming off."  See Smartfoods, Inc. v. Northbrook Prop. & Cas. Co., 618 N.E.2d 1365, 1368 (Mass.App.Ct. 1993) ("Unfair competition, in its common law signification, implies palming off.").  Palming off is "'an attempt by one person to induce customers to believe that his products are actually those of another.'"  Kazmaier v. Wooten, 761 F.2d 46, 52 (1st Cir. 1985) (quoting Remco Industries v. Toyomenka, Inc., 286 F. Supp. 948, 954 (S.D.N.Y. 1968), aff'd, 397 F.2d 977 (2d Cir. 1968).  By contrast, Addamax blames OSF for not using Addamax software in its operating system, and attributes this decision to an illegal scheme of monopolization and price-fixing.  Whereas palming off involves the illicit identification or association of the defendant's product with the plaintiff's, Addamax's major grievance is that OSF disassociated itself from Addamax, thereby foreclosing the company's participation in a large segment of the UNIX software market.  Thus the Addamax complaint is not reasonably susceptible of an interpretation that it indicated or adumbrated a claim for unfair competition.

---

insurance companies have consistently refused to define, and that has generated literally hundreds of lawsuits, with widely varying results, cannot, under our application of commonsense, be termed unambiguous.").  Id.  However, New Castle County addressed the phrase "invasion of the right of private occupancy," id., not the phrase "unfair competition" at issue here.

Massachusetts's decision to construe the advertising injury of unfair competition in a general commercial liability insurance policy as equivalent in scope to the state common law tort of the same name reflects the approach of a majority of jurisdictions. See Atlantic Mut. Ins. Co. v. Biotech Corp., 857 F. Supp. 423, 429 (E.D. Pa. 1994) (collecting cases); Standard Fire Ins. Co. v. People's Church of Fresno, 985 F.2d 446 (9th Cir. 1993); Gencor Indus., Inc. v. Wausau Underwriters Ins. Co., 857 F. Supp. 1560 (M.D. Fla. 1994); Pine Top Ins. Co. v. Public Util. Dist. No. 1, 676 F. Supp. 212 (E.D. Wash. 1987); QSP, Inc. v. Aetna Cas. and Sur. Co., 773 A.2d 906 (Conn. 2001); Bank of the West v. Superior Court, 833 P.2d 545 (1992). In fact, at the time OSF and USF&G signed the relevant insurance contracts, "all federal court decisions [but one had] been consistent in their support of the common law definition" of unfair competition as "'palming off' or 'passing off,' that is, usurping the commercial advantage of another by deceptively substituting one's own goods for those of the competitor." Terri D. Keville, Advertising Injury Coverage: An Overview, 65 S. Cal. L. Rev. 919, 954 (1992).[7]

OSF nonetheless contends that Addamax's complaint triggered a duty to defend under the advertising injury clauses of the policies because several claims in the Addamax complaint-- including antitrust, Chapter 93A, and interference with business

_____

[7]The one exception, Keating v. National Union Fire Insurance Co., 754 F. Supp. 1431 (C.D. Cal. 1990), has since been reversed by the Ninth Circuit on appeal. See Keating v. National Union Fire Insurance Co., 995 F.2d 154 (1991).

relations claims--convey "unfair competition" in common parlance. The district court acknowledged that, "In a general sense, [such] violations might be thought of as a species of 'unfair competition' because they entail methods of competition that are illegal and thus unfair." OSF, 2001 WL 1298878, at *7. However, it ultimately found OSF's argument unpersuasive because the insurance contract is a legal document, and parties signing it should "expect that a legal term used in the policy will be accorded the meaning that the courts have given it." Id. We agree. A treatise on the topic reinforces the district court's analysis:

> In its general sense, "unfair competition" is defined as "all dishonest or fraudulent rivalry in trade and commerce" (Black's Law Dictionary), thus encompassing a potentially large number of different offenses. . . .
> However, the definition of unfair competition quoted above goes on to state that the term "is particularly applied to the practice of endeavoring to substitute one's own goods or products in the markets for those of another having an established reputation and extensive sales, by means of imitating or counterfeiting the name, title, size, shape, or distinctive peculiarities of the article, or the shape, color, label, wrapper, or general appearance of the package . . . the imitation being carried far enough to mislead the general public or deceive an unwary purchaser, and yet not amounting to an absolute counterfeit or to the infringement of a trade-mark or trade-name." In this more limited meaning, which seems more likely to be applicable in the context of advertising injury, unfair competition is much the same as . . . misappropriation of advertising ideas or style of doing business.

-15-

Jeffrey W. Stempel, Law of Insurance Contract Disputes § 14.06, at 14-22 (2d ed. 2001) (quoting Donald S. Malecki and Arthur L. Flitner, Commercial General Liability 69-70 (6th ed., 1998)).

The relevant sections of the policies define covered "advertising injuries" as those arising out of "libel, slander, defamation, violation of right of privacy, piracy, unfair competition, or infringement of copyright, title or slogan" (in the general policy) and "(a) libel, slander or defamation; (b) infringement of copyright or of title or of slogan; (c) piracy or unfair competition or idea misappropriation under an implied contract; (d) invasion of the right of privacy" (in the excess policy). Applying the interpretive principle of noscitur a sociis[8] to language in an almost identical GCL policy, the Seventh Circuit observed that:

> A word sometimes picks up meaning from its neighbors; and all the other terms in the list of wrongs insured under the rubric of "advertising injury" concern the misuse of information, as befits the word "advertising." Piracy and the infringement of copyrights, titles (presumably of books, songs, products, services, and so forth), and slogans (advertising and other) are simply different forms of theft (broadly conceived) of information. And defamation involves the use of false information, while invasion of the right of privacy the use of true, though sometimes misleading or offensive, information. Libel and slander are the two halves of defamation. . . . [I]f tortious interference [and similar claims are] covered by the policy, the policy has a bulge not

---

[8]Loosely translated, noscitur a sociis means "it is known from its associates." As a canon of construction, it means that "the meaning of a word is or may be known from the accompanying words." Black's Law Dictionary 1060 (6th ed. 1990).

> easy to make sense of or to attribute to the
> deliberate choice of the parties.

Curtis-Universal, Inc. v. Sheboygan Emergency Med. Servs., 43 F.3d 1119, 1124 (7th Cir. 1994).

The terms surrounding "unfair competition" in the advertising injury provisions of the USF&G policies exclusively denote communicative harms (injuries that occur <u>as a direct result of</u> communication), not illegal courses of conduct that merely involve communication. We are not persuaded by the appellant's attempt to apply the latter gloss to the term, just as the Seventh Circuit was unmoved by the same tactic in Curtis-Universal: "[W]e find it highly implausible to suppose that 'unfair competition' in a list of torts otherwise concerned mainly with harmful speech in various forms (defamation, invasion of the right of privacy, copyright infringement) would sweep under the policy a general, albeit only prima facie, liability for antitrust damages" and other causes of action not constituted by communicative harms. Id. at 1123.[9]

---

[9]OSF argues that the Addamax litigation is covered by the policy because the eighth "claim for relief" in Addamax's complaints accuse OSF of "Unfair Methods of Competition in Violation of the Massachusetts Unfair Trade Practices Act." As the district court pointed out, "Massachusetts courts construe the term 'unfair competition' in a liability insurance policy not only to signify that common law tort, but also to distinguish it from the statutory cause of action for unfair business practices under Chapter 93A." OSF, 2001 WL 1298878, at *6 (citing Smartfoods, Inc. v. Northbrook Prop. & Cas. Co., 618 N.E.2d 1365, 1368 (Mass. App. Ct. 1993)). Addamax was suing for violation of Chapter 93A, not for common law unfair competition. Cf. Graham Resources, Inc. v. Lexington Insurance Co., 625 So. 2d 716, 721 (La. Ct. App. 1993) (observing that "in all of the out-of-state cases we have reviewed," courts have ruled that unfair competition in context of

## IV. Personal Injury

The only terms in the "personal injury" sections of the two policies that possibly pertain to Addamax's suit are harms caused by communication. The harms are defined as

> injury arising out of one or more of the following offenses committed during the policy period . . . (3) a publication or utterance (a) of a libel or slander or other defamatory or disparaging material, or (b) a publication or utterance in violation of an individual's right of privacy; except publications or utterances in the course of or related to advertising, broadcasting, publishing or telecasting activities conducted by or on behalf of the named insured shall not be deemed personal injury.

The Umbrella Policy providing excess coverage similarly covers damages from

> injury arising out of . . . (b) the publication or utterance of a libel or slander or other defamatory or disparaging material or a publication or utterance in violation of an individual's right of privacy; except publications or utterances in the course of or related to advertising activities.

Addamax makes no reference to a claim for defamation or disparagement in either of its complaints or in its initial demand letter to OSF. Nonetheless, OSF argues that the complaints, considered in light of extrinsic evidence either provided to or readily knowable by USF&G, "adumbrate" defamation and disparagement claims. See Continental Cas. Co., 461 N.E.2d at 212 ("if the allegations of the complaint are 'reasonably susceptible'

---

insurance coverage for advertising injury does not refer to conduct prohibited by statute).

of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense").

Maneuvering within the interpretive boundaries of the "adumbrate" standard, see supra note 3, OSF insists that liability coverage is triggered under the personal injury provisions of its policies on the theory that Addamax's "damages[] allegedly occurred, at least in part, because the communications [by OSF] to [its] Sponsors and Members about the selection of Secureware as superior lowered Addamax in rank and estimation." OSF further contends that such "allegedly false statements . . . [could] prejudice the plaintiff in the conduct of its business . . . [and therefore] are sufficient to state a claim for disparagement as to products and defamation as to the source of these goods under Massachusetts law."

As noted, OSF's personal injury coverage extends to liability from injuries arising out of "other defamatory or disparaging material," and not just to liability for "defamation" and "disparagement" actions themselves. Interpreting this phrase in a similar GCL policy, the SJC observed that "[d]isparage means, among other things, 'to lower in rank and estimation by actions or words,' or 'to speak slightingly of.'" Boston Symphony, 545 N.E.2d at 1158 (quoting Webster's New International Dictionary of the English Language 750 (2d ed. 1959)).

OSF contends that all of Addamax's claims--including its antitrust, Chapter 93A, and tortious interference claims--were based (at least in part) on words and actions of OSF that

-19-

explicitly or implicitly lowered Addamax in rank and estimation. OSF's initial tender of the defense arguably alerted USF&G to the publication of disparaging and defamatory materials in various forms: 1) OSF advertisements promoting the RFT process generally, 2) the RFT process itself, 3) a "Security Rationale document" that identified Addamax and Secureware as the two companies competing in the Security RF and justified OSF's selection of the Secureware product, 4) additional advertising after the completion of the Security RFT announcing the selection of Secureware and touting the impartiality of the RFT process, and 5) other unspecified publications referred to in Addamax's complaint lauding the superior capabilities of Secureware. OSF's re-tender of the defense through this declaratory judgment action disclosed a sixth source of defamatory or disparaging materials--rumors of Addamax's impending bankruptcy in the wake of its loss to Secureware in the RFT.

We assume arguendo that these facts, identified in the Addamax complaints or extrinsic to them, constituted "disparaging or defamatory material" in the Boston Symphony sense of diminishing Addamax's reputation. We further assume that USF&G can be charged with knowledge of all the extrinsic facts cited by OSF. USF&G does not argue (with respect fo OSF) that re-tender of the defense through this declaratory judgment action violated particular notice requirements in the USF&G policies. See Transamerica Ins. Co. v. Norfolk and Dedham Mut. Fire Ins. Co., 279 N.E.2d 686, 689 (Mass. 1972); see also Hoppy's Oil Serv.,

-20-

Inc., v. <u>Insurance Co. of North America</u>, 783 F. Supp. 1505, 1509 (D. Mass. 1992) ("No duty to defend or to participate in a defense can arise before the insurer has notice of the suit against the insured, or at least of the underlying claim and the likelihood of suit."). Moreover, Massachusetts law imposes a broad duty to investigate on liability insurers after the insured has tendered a defense. <u>See</u> Mass. Gen. Laws ch. 176D, § 3(9) (1998) ("An unfair claim settlement practice shall consist of...(d) [r]efusing to pay claims without conducting a reasonable investigation based upon all available information"). Nevertheless, we conclude that these extrinsic facts, viewed as aids in the interpretation of the Addamax complaints, did not trigger a duty to defend because Addamax was not alleging that the material cited by OSF caused its injuries. <u>See</u> <u>Ekco Group, Inc.</u> v. <u>Travelers Indem. Co.</u>, 273 F.3d 409, 415 (1st Cir. 2001) ("There must be some causal connection running from the offense . . . to the injury."); <u>Knoll Pharm. Co.</u> v. <u>Automobile Ins. Co.</u>, 152 F. Supp. 2d 1026, 1038 (N.D. Ill. 2001) ("The causal connection between the insured's activities and the alleged injury is the salient factor in determining a duty to defend.").

Significantly, the USF&G policies only provide coverage for "injur[ies] <u>arising out of</u> . . . defamatory or disparaging material . . . committed [or created] during the policy period" (emphasis added). Interpreting identical language in the "advertising injury" clause of a similar policy, the Second Circuit recently held that "the relevant causation issue with

-21-

regard to insurance coverage is not whether 'the injury could have taken place without the advertising,' but 'whether the advertising did in fact[10] contribute materially to the injury.'" R.C. Bigelow v. Lib. Mut. Ins. Co., 287 F.3d 242, 248 (2d Cir. 2002) (quoting Frog, Switch, & Mfg. Co. v. Travelers Ins. Co., 193 F.3d 742, 750 n.8 (3d Cir. 1999)).[11]

We conclude that Massachusetts courts would impose a similar "material contribution" requirement when construing this language in a commercial general liability insurance policy. Cf. Eagle-Picher Indus., Inc. v. Liberty Mut. Ins. Co., 829 F.2d 227, 248 (1st Cir. 1987) (predicting the SJC's response to a choice-of-law question that the court had yet to address directly). To determine the level of causation implicated by the phrase "arising out of" in a liability insurance policy under Massachusetts law, we have previously looked to Massachusetts cases construing this phrase in the automobile insurance context. See Merchants Ins.

---

[10]We do not read the phrase "whether the advertising did in fact contribute materially to the injury" as predicating an insurer's duty to defend on the facts proven at trial. Indeed, we could not read the phrase that way. The Supreme Judicial Court has observed that "[t]he obligation of an insurer to defend is not, and cannot be, determined by reference to the facts proven at trial. Rather, the duty to defend is based on the facts alleged in the complaint..." Boston Symphony, 545 N.E.2d at 1158. As used in the R.C. Bigelow decision, the phrase "in fact" simply emphasizes that the insured cannot trigger a duty to defend unless the acts alleged in the underlying complaint that supposedly fall within the coverage of the liability policy are further alleged by the plaintiff in that action to have contributed materially to the injury.

[11]We see no reason to construe the phrase "arising out of" differently in the advertising injury and personal injury provisions of the USF&G policies.

Co. of New Hampshire, Inc. v. USF&G, 143 F.3d 5 (1st Cir. 1998). In Merchants Ins. Co., the parties disputed whether the insurer's duty to defend was triggered under a policy provision that expanded the definition of an "insured" to "the person or organization shown in the Schedule . . . but only with respect to liability arising out of 'your work' for that insured by or for you." Id. at 9 (emphasis added). To determine the meaning of the phrase "arising out of", we relied heavily on the SJC's opinion in Rischitelli v. Safety Ins. Co., 671 N.E.2d 1243 (Mass. 1996), where the court sought to determine whether the insured's automobile insurance policy covered injuries that he sustained when another motorist physically attacked him after their vehicles were involved in an accident. We observed in Merchants Ins. Co. that

> [t]he Massachusetts Supreme Judicial Court confirmed in Rischitelli: "The expression 'arising out of' indicates a wider range of causation than the concept of proximate causation in tort law." By way of further explanation, Rischitelli went on to say: "However, the expression does not refer to all circumstances in which the injury would not have occurred 'but for' the involvement of a motor vehicle."

Merchants Ins. Co., 143 F.3d at 9-10.

The SJC recently reaffirmed its interpretation of the phrase "arising out of" in Rischitelli. See Ruggerio Ambulance Serv., Inc. v. National Grange Mut. Ins. Co., 724 N.E.2d 295, 299 (Mass. 2000) ("The expression 'arising out of' indicates a wider range of causation than the concept of proximate causation in tort law . . . However, the expression does not refer to all

-23-

circumstances in which the injury would not have occurred 'but for' the involvement of a motor vehicle." (citing Rischitelli, 671 N.E.2d at 1245.)). As noted above, the "contribute materially" standard similarly connotes a range of causation narrower than "but-for causation": "[T]he relevant causation issue with regard to insurance coverage is not whether the 'the injury could have taken place without the advertising' [but-for causation], but whether the advertising did in fact contribute materially to the injury." R.C. Bigelow, 287 F.3d at 248 (citations omitted) (emphasis in original). Consequently, the "contribute materially" causation requirement set forth in R.C. Bigelow appears to fit comfortably within the Ruggerio parameters.

There is no claim for defamation or disparagement in the Addamax complaints, and no reliance on defamatory or disparaging materials circulated by OSF as a cause of injury. Indeed, the complaints pursue a different theme entirely by focusing on OSF's structure and activities while largely ignoring its words. This presentation begins with the complaints' portrayal of the consortium as the singular force in the market for UNIX operating system software: "Addamax's market consisted of OSF's Sponsors as well as smaller computer vendors and system integrators, the overwhelming majority of whom are non-voting Members of OSF." Complaint at 12, Addamax v. Open Software Foundation, 964 F. Supp. 549 (D. Mass. 1997) (emphasis added); see also First Amended Complaint at 9-10, 17, 34.

-24-

Addamax subsequently chronicles the diminishing purchasing power of vendors outside the OSF membership group, and asserts that a software producer's failure to successfully market its product to OSF was tantamount to foreclosure from the entire market. "Whereas previously . . . Addamax had a potential market of numerous computer vendors, . . . the formation of OSF has caused a consolidation of that market into one dominant customer, i.e. OSF. As a result, the software developers, such as Addamax, that are not selected by the cartel are foreclosed from the market." Id. at 14-15; see also First Amended Complaint at 22-23. Not surprisingly, the complaints attribute Addamax's injuries solely to the purchasing decisions of OSF members without mentioning vendors outside the OSF group:

> OSF and its Sponsors . . . have foreclosed Addamax from selling its B1st product to the more than 70% of the UNIX operating system market represented by OSF and its membership. Accordingly, Addamax has been injured in its business and property through the loss of millions of dollars in past, present, and future profits, by loss of customers and potential customers, by loss of goodwill, and by the prospective destruction of its business.

Complaint at 22, 25, 30 (emphasis added); see also First Amended Complaint at 20-21, 25, 30-31, 34.

The noteworthy absence of any defamation or disparagement claim against OSF is consistent with Addamax's understanding of the UNIX software market as memorialized in the complaints. If vendors outside the OSF membership group were a minimal presence in the market for UNIX operating system software,

-25-

any disparaging or defamatory materials published by OSF (which by that time had already decided to bundle Secureware's product into OSF/1) could not have materially contributed to Addamax's injuries.

No extrinsic facts or documents proffered by OSF contradict Addamax's characterization of OSF in its complaints as a monopsonist in the market for UNIX operating system software, or allude to the presence of a significant consumer base outside of OSF's membership.[12] Therefore, even if we assume that every extrinsic fact referenced by OSF was properly brought to USF&G's attention when OSF tendered the defense, OSF cannot demonstrate that these facts "contribute[d] materially" to the injuries alleged by Addamax in its complaint. R.C. Bigelow, 287 F.3d at 248. At worst, these extrinsic facts suggest that OSF's publication of disparaging materials and propagation of bankruptcy rumors adversely impacted Addamax's business relationships with the comparatively small number of computer vendors outside the OSF membership group. Even construing these facts in the light most

_____

[12]The absence of a substantial consumer base with the capacity to alter its purchasing behavior in response to disparaging or defamatory material distinguishes this case from Knoll Pharm. Co., 152 F. Supp. 2d at 1026 (N.D. Ill. 2001), which OSF relies heavily upon in its brief. In Knoll, the insured sold a synthetic thyroid hormone that it promoted as being superior to competing generic drugs on the basis that there was "no proven bioequivalent product." Id. at 1030. The district court ruled that the insured was entitled to coverage under their liability policy, noting inter alia that such disparaging and misleading remarks by the insured may have induced plaintiffs (purchasers of health and medical supplies) to substantially overpay for the insured's thyroid drug when they could have purchased a cheaper generic drug with the equivalent biological composition.

favorable to OSF, the financial impact of OSF's words pales in comparison to the economic effect of its deeds, which foreclosed Addamax from 70% of the entire market for its UNIX operating system software. Indeed, by its own terms in the complaints, Addamax dismisses losses from vendors outside OSF as immaterial: "[T]he software developers, such as Addamax, that are not selected by the cartel are foreclosed from the market." Complaint at 14-15; see also First Amended Complaint at 22-23. Accordingly, we conclude that any injuries resulting from the publication of the "extrinsic facts" cited by OSF are not sufficiently material to satisfy the "arising under" requirement in the personal injury provisions. R.C. Bigelow, 287 F.3d at 248.

## V. Conclusion

Determining whether complaints state a claim for a given cause of action is a relatively straightforward matter; determining whether they adumbrate, or faintly sketch, a claim is a more difficult interpretive question. However, there is a discernible line between adumbration in a complaint and the mischaracterization of a complaint by an insured relying creatively on extrinsic facts. Although OSF may detect a sketch or suggestion of covered claims in Addamax's complaints, and the extrinsic facts cited, we do not. We therefore conclude that USF&G was not obliged to defend the Addamax action.

**Affirmed.**